## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| RWJ MANAGEMENT CO., INC., _et al._[1] | ) | Case No. 11-34845 (ERW) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | **Hearing Date and Time:** |
| | ) | **September 3, 2013, at 9:30 a.m.** |

## NOTICE OF MOTION

TO:   See attached service list

**PLEASE TAKE NOTICE** that on Tuesday, September 3, 2013, at 9:30 a.m., or as soon thereafter as counsel may be heard, we shall appear before the Honorable Eugene R. Wedoff of the United States Bankruptcy Court for the Northern District of Illinois, Eastern Division, or any Judge sitting in his place or stead, in courtroom 744 of the United States Courthouse, 219 South Dearborn Street, Chicago, Illinois, and then and there present the **Application of Adelman & Gettleman, Ltd., Counsel to the Debtors, for the Allowance and Payment of Final Compensation, Reimbursement of Expenses and for Related Relief** (the "Motion") a copy of which is attached hereto and hereby served upon you.

/s/ Mark A. Carter, Esq.
Mark A. Carter, Esq. (ARDC #6199602)
Steven B. Chaiken, Esq. (ARDC #6272045)
**ADELMAN & GETTLEMAN, LTD.**
53 West Jackson Boulevard, Suite 1050
Chicago, Illinois 60604
Telephone: 312-435-1050
Facsimile: 312-435-1059
_Counsel for the Debtors_

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing Notice of Motion and Motion referred to therein were served upon the persons listed on the attached Service List as indicated via the Court's CM/ECF filing system this 12th day August, 2013 and by depositing same in the U.S. Mail, first class, postage prepaid, at 53 West Jackson Blvd., Chicago, Illinois, 60604 this 12th day of August, 2013.

/s/ Mark A. Carter
Mark A. Carter, Esq.

---

[1] The Debtors in these chapter 11 cases are: RWJ Crestwood, LLC, RWJ Downers Grove, LLC, RWJ Elmhurst, LLC, RWJ Forestview, LLC, RWJ Glen Ellyn, LLC, RWJ Management Co., Inc., RWJ Management Co. II, Inc., RWJ Munster, LLC, RWJ Plainfield, LLC, RWJ Romeoville, LLC, RWJ Wauconda, LLC, and RWJ Yorkville, LLC.

225773

## SERVICE LIST

### VIA CM/ECF

Sarah Baker on behalf of
Trustee Philip V Martino, ESQ
sarah.baker@quarles.com
milli.zukowsky@quarles.com

Lauren N. Beslow on behalf of
Trustee Philip V Martino, ESQ
Lauren.Beslow@quarles.com
Faye.Feinstein@quarles.com

Richard A Bixter on behalf of Interested
Party Illinois Department Of Transportation
richard.bixter@hklaw.com

Christopher M Cahill on behalf of
Financial Advisor McGladrey LLP
ccahill@lowis-gellen.com
abockman@lowis-gellen.com

Kurt M Carlson on behalf of
Creditor Exelon Energy Company
kcarlson@carlsondash.com
knoonan@carlsondash.com

Carmen D Caruso on behalf of
Creditor RWJ Management Co. II, Inc.
sms@cdcaruso.com
cdc@cdcaruso.com

Rosanne Ciambrone on behalf of
Interested Party Robert Juckniess
rciambrone@duanemorris.com
jkahane@duanemorris.com

Christopher Combest on behalf of
Trustee Philip V Martino, ESQ
christopher.combest@quarles.com
Faye.Feinstein@quarles.com
Sarah.Baker@quarles.com

Faith Dolgin on behalf of Interested
Party Illinois Department Of Transportation
faith.dolgin@illinois.gov

Jeremy M Downs on behalf of
Creditor BMO Harris Bank N.A.
jeremy.downs@goldbergkohn.com
kristina.bunker@goldbergkohn.com

David R Doyle on behalf of
Other Prof. The Shiner Group
ddoyle@shawfishman.com

Devon J Eggert on behalf of Creditor
Committee Official Committee Of
Unsecured Creditors
deggert@freeborn.com
bkdocketing@freeborn.com

Chester H. Foster, Jr. on behalf of Interested
Party Robert Juckniess
chf@fosterlegalsvcs.com
dbf@fosterlegalservices.com

Joseph D Frank on behalf of
Creditor Committee
Bottling Group, LLC d/b/a
Pepsi Beverages Company
jfrank@fgllp.com
ccarpenter@fgllp.com
jkleinman@fgllp.com

E. Philip Groben on behalf of
Defendant Parent Petroleum
pgroben@cohenandkrol.com
trotman@cohenandkrol.com
pmchugh@cohenandkrol.com

Aaron L. Hammer on behalf of
Creditor Committee
Official Committee Of Unsecured
Creditors
ahammer@sugarfgh.com
chorvay@sugarfgh.com
mbrandess@sugarfgh.com
joconnor@sugarfgh.com
mmelickian@sugarfgh.com
bkdocket@sugarfgh.com

225773

dmadden@sugarfgh.com

Danielle Juhle on behalf of Creditor
BMO Harris Bank N.A.
danielle.juhle@goldbergkohn.com
kristina.bunker@goldbergkohn.com

Jeremy C. Kleinman on behalf of Creditor
Committee Bottling Group, LLC
d/b/a Pepsi Beverages Company
jkleinman@fgllp.com
ccarpenter@fgllp.com

Gina B Krol, ESQ on behalf of
Creditor Parent Petroleum Inc.
gkrol@cohenandkrol.com
jhazdra@cohenandkrol.com
gkrol@cohenandkrol.com

L Katie Mason on behalf of
Interested Party Sasafrasnet, LLC
kmason@reinhartlaw.com
kmason@reinhartlaw.com

William J McKenna on behalf of
Defendant Atlas Oil Company
wmckenna@foley.com,
thardy@foley.com;khall@foley.com

Phillip W. Nelson on behalf of
Creditor Graham Enterprise Inc.
pnelson@edwardswildman.com,
ksoto@edwardswildman.com;ECFFilings@e
dwardswildman.com

Mark Page on behalf of Creditor BP Products
North America Inc.
mpage@kelleydrye.com,
KDWBankruptcyDepartment@kelleydrye.co
m;BankruptcyDepartment@Kelleydrye.com

Lars A Peterson on behalf of Creditor B&R
Oil Company, Inc.
lapeterson@foley.com
khall@foley.com

pmchugh@cohenandkrol.com

Richard S Lauter on behalf of Creditor
Committee
Official Committee Of Unsecured Creditors
rlauter@freeborn.com
bkdocketing@freeborn.com

Patrick S Layng
USTPRegion11.ES.ECF@usdoj.gov

Philip V Martino, ESQ
philip.martino@quarles.com
pmartino@ecf.epiqsystems.com
jim.irving@DLApiper.com
colleen.greer@quarles.com;
wemet@quarles.com

Brian L. Shaw on behalf of Other Prof.
Romeoville Development L.L.C.,
Bshaw100@shawfishman.com
bharrington@shawfishman.com

David J. Simmons on behalf of Creditor BP
Products North America Inc.
ds@greensfelder.com
dmh@greensfelder.com
meg@greensfelder.com
jep@greensfelder.com

Roman Sukley on behalf of U.S. Trustee
Patrick S. Layng
USTPRegion11.es.ecf@usdoj.gov
Roman.l.sukley@usdoj.gov
Cameron.g.gulden@usdoj.gov

John R. Weiss on behalf of Interested Party
Robert Juckniess
jrweiss@duanemorris.com

225773

## VIA U.S. MAIL

RWJ Plainfield, LLC;
RWJ Management Co., Inc.;
RWJ Management Co. II, Inc.;
RWJ Romeoville, LLC;
RWJ Forestview, LLC;
RWJ Glen Ellyn, LLC;
RWJ Crestwood, LLC;
RWJ Downers Grove, LLC;
RWJ Elmhurst, LLC;
RWJ Wauconda, LLC; and
RWJ Yorkville, LLC
c/o Illinois Corporation
Service C – Registered Agent
801 Aldlai Stevenson Drive
Springfield, IL 62703

RWJ Munster, LLC
c/o Corporation Service Company – Registered
Agent
251 East Ohio Street
Suite 500
Indianapolis, IN 46204

Robert W. Juckniess
821 North Washington
Hinsdale, IL 60521

225773

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| RWJ MANAGEMENT CO., INC., *et al.*[1] | ) | Case No. 11-34845 (ERW) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |

## APPLICATION OF ADELMAN & GETTLEMAN, LTD., COUNSEL TO THE DEBTORS, FOR THE ALLOWANCE AND PAYMENT OF FINAL COMPENSATION, REIMBURSEMENT OF EXPENSES AND FOR RELATED RELIEF

**MARK A. CARTER, ESQ. (ARDC #6199602)**
**STEVEN B. CHAIKEN, ESQ. (ARDC #6272045)**
**ADELMAN & GETTLEMAN, LTD.**
**53 West Jackson Boulevard, Suite 1050**
**Chicago, Illinois 60604**
**312-435-1050**
**Counsel to the Debtors**

---

[1] The debtors in these chapter 11 cases are: RWJ Crestwood, LLC, RWJ Downers Grove, LLC, RWJ Elmhurst, LLC, RWJ Forestview, LLC, RWJ Glen Ellyn, LLC, RWJ Management Co., Inc., RWJ Management Co. II, Inc., RWJ Munster, LLC, RWJ Plainfield, LLC, RWJ Romeoville, LLC, RWJ Wauconda, LLC, and RWJ Yorkville, LLC.

# TABLE OF CONTENTS

I.      INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.     GENERAL BACKGROUND AND STATUS OF THE CASES . . . . . . . . . . . . . . . . . . 7

        A.      BACKGROUND OF THE RWJ DEBTORS . . . . . . . . . . . . . . . . . . . . . 7
        B.      DEBTOR IN POSSESSION AND CASE ADMINISTRATION . . . . . . 10
        C.      THE BP LITIGATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
        D.      SALE EFFORTS DURING THE DIP PERIOD . . . . . . . . . . . . . . . . . . 15
        E.      APPOINTMENT OF THE CHAPTER 11 TRUSTEE . . . . . . . . . . . . . 18

III.    INTERIM COMPENSATION PAID TO MOVANT AND BMO LIEN CARVEOUTS
        APPROVED DURING THE DIP PERIOD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

IV.     LEGAL SERVICES RENDERED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

        A.      ADMINISTRATIVE MATTERS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
        B.      CASH COLLATERAL/DIP FINANCING . . . . . . . . . . . . . . . . . . . . . . 34
                i.      CASH COLLATERAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
                ii.     DIP FINANCING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
        C.      EXECUTORY CONTRACTS AND UNEXPIRED LEASES . . . . . . . . 38
                i.      UNEXPIRED LEASE MATTERS . . . . . . . . . . . . . . . . . . . . . . 39
                ii.     FUEL SUPPLY ARRANGEMENTS . . . . . . . . . . . . . . . . . . . . 43
                iii.    OTHER EXECUTORY CONTRACT MATTERS . . . . . . . . . . . 45
        D.      PLAN OF REORGANIZATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46
        E.      BP MATTERS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51
        F.      FUEL SUPPLY LITIGATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55
        G.      ASSET SALE EFFORTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59
        H.      FEE PETITION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

V.      ASSISTANCE OF THE CHAPTER 11 TRUSTEE . . . . . . . . . . . . . . . . . . . . . . . . . . 66

VI.     STANDARDS FOR REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

VII.    BILLING JUDGMENT AND AVOIDANCE OF DUPLICATION OF SERVICES . . . 72

VIII.   QUALIFICATIONS OF MOVANT; PRECLUSION OF EMPLOYMENT DUE TO
        ACCEPTANCE OF THIS CASE; AND COST OF COMPARABLE SERVICES . . . . 76

IX.     RECAPITULATION OF SERVICES RENDERED DURING THE DIP PERIOD . . . . 82

X.      MOVANT'S STATEMENT PURSUANT TO §§ 329 AND 504 OF THE
        BANKRUPTCY CODE AND BANKRUPTCY RULE 2016 . . . . . . . . . . . . . . . . . . . 83

XI.   NOTICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

XII.  CONCLUSION AND REQUEST FOR ALLOWANCE AND PAYMENT OF FINAL
      COMPENSATION AND REIMBURSEMENT OF EXPENSES . . . . . . . . . . . . . . . . . . 84

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| RWJ MANAGEMENT CO., INC., *et al.*[1] | ) | Case No. 11-34845 (ERW) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Hearing Date and Time:** |
| | ) | **September 3, 2013, at 9:30 a.m.** |

## APPLICATION OF ADELMAN & GETTLEMAN, LTD., COUNSEL TO THE DEBTORS, FOR THE ALLOWANCE AND PAYMENT OF FINAL COMPENSATION, REIMBURSEMENT OF EXPENSES AND FOR RELATED RELIEF

TO:   THE HONORABLE EUGENE R. WEDOFF,
      UNITED STATES BANKRUPTCY JUDGE:

Now comes Mark A. Carter, Steven B. Chaiken and the firm of Adelman & Gettleman,

Ltd. ("Movant"), counsel to the Debtors herein, and requests the entry of an order for the

allowance and payment of final compensation and reimbursement of ordinary and necessary

expenses incurred in connection therewith as counsel to the Debtors and Debtors-in-Possession

during these Chapter 11 cases (the "Chapter 11 Cases") pursuant to Section 330 of the United

States Code (the "Code"), and Rule 2016 of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules"), and in support thereof, respectfully states as follows:

---

[1] The debtors in these chapter 11 cases are: RWJ Crestwood, LLC, RWJ Downers Grove, LLC, RWJ Elmhurst, LLC, RWJ Forestview, LLC, RWJ Glen Ellyn, LLC, RWJ Management Co., Inc., RWJ Management Co. II, Inc., RWJ Munster, LLC, RWJ Plainfield, LLC, RWJ Romeoville, LLC, RWJ Wauconda, LLC, and RWJ Yorkville, LLC (collectively, the "Debtors").

## I. INTRODUCTION

1.      This final application encompasses the nineteen (19) month period from August

26, 2011, the date of the commencement of the Chapter 11 Cases, through March 27, 2013, the

date the Court entered an order approving the appointment of a Chapter 11 trustee (the "DIP

Period").

2.      Movant assisted the Debtors in a myriad of tasks during the DIP Period under

limited, often "emergency" time frames. The areas of services rendered by Movant on behalf of

the Debtors in these Chapter 11 Cases can be summarized as follows:

- ●    General Administrative Matters:

     - Prepared, filed and obtained the relief sought in the Debtors' "First Day"
     motions and requests to retain the necessary professionals on behalf of the
     Debtors;

     - Prepared, revised and filed each of the Debtors' Bankruptcy Schedules and
     Statement of Financial Affairs and periodic DIP Operating Reports and related
     information disclosures in the Chapter 11 Cases;

     - Sought and obtained approval of settlements of condemnation cases involving
     the Debtors;

     - Negotiated and obtained the entry of an employee bonus and severance package
     to maintain the Debtors' 115 member workforce while the Debtors' sale process
     was ongoing;

     - Established a claims bar date from which the claims against the Debtors' estates
     could be analyzed determined; and

     - Performed tasks in the administration of the Debtors' estates over nineteen (19)
     months in these Chapter 11 Cases.

- ●    Cash Collateral/DIP Financing:

     - Conducted negotiations with the Debtors' secured creditor regarding its secured
     position, the use of cash collateral and proposed cash collateral orders;

2

- Obtained the entry of one (1) final agreed cash collateral order, two (2) final DIP Financing Orders and thirty three (33) separate extension orders after attending and participating at the hearings with respect to same;

- Negotiated and obtained a carveout of proceeds from the liens and security interests of the secured creditor in an amount sufficient to satisfy employee retention and severance expenses and anticipated post-sale "run-off" costs and related expenses to protect the Debtors' estates; and

- Negotiated and obtained a carveout of proceeds from the liens and security interests of the secured creditor in an amount sufficient to satisfy known expenses of estate professionals to protect the Debtors' estates.

- Leases and Executory Contracts:

- Prepared and filed the necessary motions to extend and preserve each of the Debtors' four (4) non-residential real property leases on the Debtors' motor fuel stations;

- Analyzed and advised the Debtors regarding their rights with respect ro the Debtors' executory contracts and the obligations of third party vendors thereunder; and

- Negotiated and documented two (2) new fuel supply arrangements with one of the Debtors' jobbers, which were held pending sale efforts with respect to the Debtors' assets.

- Plan of Reorganization:

- Analyzed and advised the Debtors regarding their alternatives with respect to the negotiation, filing and confirmation of a Chapter 11 plan;

- Researched, prepared and circulated amongst creditor constituencies a Joint Chapter 11 Plan of Reorganization and related schedules in the Chapter 11 Cases; and

- Negotiated alternative terms of a consensual Chapter 11 plan with the Debtors' secured creditor and suppliers.

- BP Matters:

- Analyzed and advised on the Debtors' rights with respect to the rejection and subsequent termination of the BP am/pm Franchise Agreements;

3

- Researched and prepared a complaint for a declaratory judgment as to the extent and scope of the BP Use Restrictions on the Debtors' motor fuel stations and related matters; and

- Formulated and delivered multiple settlement proposals with BP and engaged in discussions with BP over an eight (8) month period after the decision in the BP Litigation was entered.

● **Fuel Supplier Matters:**

- Commenced an adversary proceeding on behalf of the Debtors against the Debtors' jobbers to ensure fuel deliveries after fuel shipments were stopped, causing certain of the Debtors' stores to "go dark" and other stores to receive "partial" fuel shipments; and

- Negotiated throughout the DIP Period for the continuance of fuel supply and for better fuel supply terms.

● **Asset Sale Efforts:**

- Prepared and assisted in the carrying out of a thorough marketing process with the Debtors' investment banker, Matrix Private Equities, Inc., over a six (6) month period, which involved the solicitation of, and exchange of information with, more than sixty (60) potential bidders;

- Negotiated, drafted and obtained "stalking horse" approval of a significant asset purchase agreement with Buck's Inc. for the purchase of substantially all of the Debtors' assets containing terms favorable to the Debtors' estates; and

- Performed other sale preparation efforts which were provided to the Trustee, allowing for a more prompt sale of substantially all of the Debtors' assets in these Chapter 11 Cases (which has now closed).

● **Chapter 11 Trustee Assistance:**

- Assisted the Trustee in providing information and documents upon the Trustee's request for the benefit of the Debtors' estates (for which Movant does not seek recovery herein).

● **Fee Petition Preparation**

- Movant prepared this detailed application as the first and only fee application in the Chapter 11 Cases.

4

3. This Final Application represents Movant's first and final application for compensation and reimbursement of expenses in the Chapter 11 Cases. As more fully described below, however, professionals for the Debtors and the Committee, including Movant, were granted the right to submit monthly invoices and receive interim payments for services rendered and expenses incurred from and after the commencement of the Chapter 11 Cases pursuant to that certain *Order Establishing Procedures for Interim Compensation and Reimbursement of Professionals and Committee Members* (the "Interim Compensation Order") entered on October 11, 2011 [**docket no. 132**]. Pursuant to the Interim Compensation Order, Movant has filed and served fourteen (14) separate monthly fee statements covering the period of August 26, 2011, through January 31, 2013 (the "Monthly Fee Statements"), none of which received an objection from any party in interest.

4. To date, Movant has received cash payments (collectively, the "Monthly Payments") in the aggregate amount of $1,402,314.94 for interim compensation and $30,859.69 (i.e. 100 % of all expenses incurred) in expense reimbursements pursuant to the Interim Compensation Order with respect to the Monthly Fee Statements.

5. In addition, prior to the commencement of these Chapter 11 Cases, Movant received $95,000.00 in advance prepayments, which were applied on an interim basis to services rendered post-petition in accordance with the Interim Compensation Order.[2]

---

[2] The prepayments received by Movant were "advanced payment retainers" of the kind addressed in *In re McDonald Bros. Construction, Inc.*, 114 B.R. 989 (Bankr. N.D.Ill. 1990) and *Hannafan and Hannafan, Ltd. v. Bloom*, 2011 IL App. (1st) 110722, 959 N.E.2d 1280 (1st Dist. 2011).

5

6.    Further, Movant has earned an additional $153,845.00 in fees and incurred

$1,040.78 in expenses during the period of February 1, 2013 through March 27, 2013, the

remaining time of the DIP Period. Attached hereto as Exhibits A through J and made a part

hereof are detailed statements of services rendered by Movant and costs incurred by Movant

during the DIP Period, including the period of February 1, 2013, through March 27, 2013.

7.    As more fully described herein, there remains unpaid the sum of $360,362.56[3] in

compensation earned by Movant for services rendered during the DIP Period, including the

preparation of this Application, and the sum of $1,040.78 for reasonable and necessary expenses

incurred by Movant on behalf of the Debtors.

8.    In summary, Movant requests final allowance of all compensation and expenses

incurred during the DIP Period, including the time spent preparing this Application. The

aggregate amount of all fees sought to be allowed as final compensation (the "Aggregate Fee

Request") for Movant is $1,857,677.50.[4] The aggregate amount of all expenses sought to be

allowed as expenses reasonably and necessarily incurred by Movant is $31,900.47 (the

"Aggregate Expense Request"). Movant also requests payment in the net amount (the "Net

---

[3]Further, during the Chapter 11 Cases, Movant and BMO-Harris Bank N.A. ("BMO") agreed to a
carveout of BMO's liens and security interests for Movant's compensation and expense reimbursement.
The carveout attributable to Movant was memorialized and approved with the other BMO-approved
professional compensation carveouts in the Final Cash Collateral Order and DIP Financing Order entered
in the Chapter 11 Cases. As of the end of the DIP Period, the carveout attributable to Movant was
$1,773,500.00 in the aggregate. Movant understands that the Trustee is holding approximately
$306,116.00 in sale proceeds with respect to the "unused" portion of Movant's carveout.

[4]As addressed in Section IV (A) herein, Movant has also waived fees for time spent by Movant,
in the amount of $52,983.00 over and above the amount of the Aggregate Fee Request with respect to
efforts spent on the Debtors' Motion to Convert Chapter 11 Cases to Chapter 7 or, In the Alternative, to
Dismiss Chapter 11 Cases [**docket no. 690**] and certain services related to the appeal of the order denying
the Debtors' request to assume and conditionally assign the Debtors' unexpired non-residential real
property leases, as an accommodation to the Debtors' bankruptcy estates.

6

Request") of $361,403.44, which represents the Aggregate Fee Request and the Aggregate Expense Request, less the aggregate amount of Monthly Payments received and Movant's prepayments applied to date.

## II. GENERAL BACKGROUND AND STATUS OF THE CASES

### A. Background of the RWJ Debtors.

9.     Since their formation in 2006, the Debtors had been operating ten (10) high profile BP-branded motor fuel sales and mini-market facilities, some of which operated a car wash (collectively, the "Stations") pursuant to agreements, licenses and other documents (the "BP Agreements") with BP Products North America, Inc. ("BP").

10.     In 2006, the Debtors acquired five (5) Stations, making the Debtors the largest initial BP franchisee east of the Rocky Mountains at that time. Over the next two years, an additional five (5) Stations were acquired by the Debtors.

11.     As of the Petition Date, the Debtors consisted of essentially two operating companies, RWJ Management Co., Inc. ("RWJ Management") and RWJ Management Co. II, Inc. ("RWJ Management II") through which nine (9) Stations in Illinois and one (1) Station in Indiana were operated. The Stations were owned or leased through RWJ Wauconda, LLC ("RWJ Wauconda"), RWJ Elmhurst, LLC, ("RWJ Elmhurst") RWJ Plainfield, LLC, ("RWJ Plainfield") RWJ Romeoville, LLC ("RWJ Romeoville"), RWJ Crestwood, LLC ("RWJ Crestwood"), RWJ Forestview, LLC ("RWJ Forestview") RWJ Munster, LLC, ("RWJ Munster") RWJ Downers Grove LLC ("RWJ Downers Grove"), RWJ Glen Ellyn LLC ("RWJ Glen Ellyn") and RWJ Yorkville LLC ("RWJ Yorkville").

7

12. RWJ Downers Grove, RWJ Glenn Ellyn, RWJ Romeoville and RWJ Munster each was a party to an unexpired lease of non-residential real property relating to Stations under which a third party non-Debtor was the lessor (the "Third Party Unexpired Leases").[5]

13. The Debtors collectively employed over 115 people and produced revenues in excess of $125,000,000 annually. On average, the Debtors dispensed more than 75,000 gallons of fuel per day to the motoring public at their ten (10) Stations. As of the filing of the Chapter 11 Cases, the Debtors were supplied fuel by B&R Oil Company, d/b/a Atlas Oil Co. ("Atlas"), Parent Petroleum, Inc. ("Parent") and Graham Enterprises, Inc. ("Graham") (collectively, the "Fuel Jobbers").

14. In the summer of 2009, the Debtors and another group of BP facility operators unrelated to the Debtors commenced separate actions against BP in the Circuit Court of Cook County, Illinois. Each Plaintiff was the franchisee of BP-branded gas stations. The suits were subsequently consolidated and the Plaintiffs filed a consolidated first amended complaint against BP in the consolidated case (the "BP Litigation"). The Plaintiffs alleged that BP had committed fraud in the franchise sales process by misrepresenting what the owner could reasonably expect to earn in these gas station businesses. The Plaintiffs also alleged claims under state franchising laws, breach of contract claims and claims arising under the Uniform Commercial Code. The original cases were removed to the U.S. District Court for the Northern District of Illinois and were subsequently sent back to the Circuit Court of Cook County.

_____

[5]In addition, there are ten (10) unexpired leases (or subleases) under which one of the two (2) Debtor operating companies is the lessee and at least one of the land owning/leasing Debtors is the lessor (collectively, the "Debtor Unexpired Leases" and together with the Third Party Unexpired Leases, the "Unexpired Leases").

8

15.     By 2010, the BP Litigation was captioned *RWJ Management Co., Inc., et al. v. BP Products North America, Inc., and NRC Realty & Capital Advisors, LLC*, case number 09 L 7891, and was pending in the Circuit Court of Cook County (the "Trial Court"). The Debtors were represented in the BP Litigation by the Law Office of Carmen D. Caruso, PC and the Coleman Law Firm (collectively, the "BP Litigation Counsel").

16.     The BP Litigation progressed beyond the summary judgment motions filed by BP, which had been denied in part. More than twenty (20) depositions were taken by both sides at locations across the country. A large and substantial amount of documents had been exchanged in discovery by the parties. Several sets of experts on each side were retained, deposed and prepared for trial. Lengthy and expensive expert reports were obtained by the Debtors. The Debtors had invested significant amounts of resources and time in prosecuting the claims alleged in the BP Litigation and the Trial Court had concluded that the claims were meritorious and should go to trial.

17.     Ultimately, a bench trial on all of the Debtors' claims in the BP Litigation, except for those of RWJ Munster, was set for the fall of 2011. The Trial Court had also concluded that RWJ Munster was entitled to a jury trial on its claims. By the summer of 2011, the Debtors and their BP Litigation Counsel were diligently preparing for trial on the Debtors' claims. After more than two (2) years spent pressing their claims through case filing, discovery and the summary judgment process, the Debtors would finally be able to present what they believed were significant claims that could, if successful, satisfy in full all of their secured indebtedness and the claims of the Debtors' other unsecured creditors.

9

18.     Unfortunately, in December of 2010, the Debtors' obligations on a $1.7 million revolving line of credit note with BMO's predecessor, M&I Marshall & Ilsley Bank, matured. Although the Debtors were paying all principal and interest due on their indebtedness at the time, the Debtors lacked sufficient funds to fully pay off the line note. Over the following (8) months, the Debtors negotiated with their secured lender regarding the extension of the note, while at the same time remaining current on all other obligations to their secured and unsecured creditors. The discussions dragged on through August of 2011, without resolution.

19.     On August 9, 2011, BMO served a notice of default and acceleration of indebtedness upon the Debtors and thereafter, a demand for assembly of collateral. The parties engaged in further discussions, which were pending on August 23, 2011, when BMO served a demand on Baytree National Bank & Trust Company, where the Debtors' bank accounts were maintained, and froze the Debtors' bank accounts.

20.     Having no other options, on August 26, 2011 (the "Petition Date"), the Debtors each filed voluntary petitions under Chapter 11 of the Code, commencing the Chapter 11 Cases.

**B.      Debtor In Possession and Case Administration**

21.     During the DIP Period, the Debtors operated their businesses and managed their properties as debtors in possession under the Sections 1107 of (a) and 1108 of the Code.

22.     On August 31, 2011, an order [**docket no. 33**] was entered providing for the joint administration of the Chapter 11 Cases.

23.     On September 7, 2011, an official committee of unsecured creditors was appointed in the Chapter 11 Cases (the "Committee") [**docket no. 40**].

10

24.    On September 13, 2011, the Debtors filed an Application (the "A&G

Application") for an Order Approving Employment of Counsel to the Debtors [**docket no. 56**]

for purposes of retaining Movant to provide legal services to the Debtors as more fully set forth

therein.

25.    Movant also filed its Disclosure of Compensation of Attorney for Debtors

[**docket no. 51**] and Movant's Engagement Letter [**docket no. 51-1**] (the "A&G Engagement

Letter") describing the terms of Movant's engagement on behalf of the Debtors in connection

with these Chapter 11 Cases, including without limitation, the hourly rates for attorneys sought

in this Application.

26.    On September 21, 2011,the Court entered an order [**docket no. 81**] granting the

A&G Application and authorizing the Debtors' employment of Movant, effective as of August

26, 2011.

27.    On September 21, 2011, the Committee's Application to Employ the firm of

Freeborn & Peters LLP as counsel for the Committee was granted [**docket no. 80**] as well.

28.    On September 28, 2011, the Debtors each filed Bankruptcy Schedules and a

Statement of Financial Affairs in their respective bankruptcy cases.

29.    On October 25, 2011, after having entered seven (7) interim cash collateral

orders, the Court entered that certain Final Order Authorizing Debtor to: (A) Use Cash

Collateral; and (B) Grant Certain Liens and Provide Security and Other Relief to BMO Harris

Bank N.A. [**docket no. 182**] (the "Final Cash Collateral Order") in the Chapter 11 Cases.

30.    The Final Cash Collateral Order was subsequently extended twenty-three (23)

separate times through the entry of periodic extension orders in these Chapter 11 Cases.

11

Throughout the Chapter 11 Cases, the Debtors obtained the authority to use cash collateral with the consent of BMO, the Debtors largest secured and unsecured creditor.

31.     On October 11, 2011, the Court entered the Interim Compensation Order **[docket no. 132]** in the Chapter 11 Cases, which applied to professionals retained by or for the Debtors and the Committee.

32.     Pursuant to the Final Cash Collateral Order and each of the subsequent cash collateral extension orders entered in the Chapter 11 Cases, BMO agreed to "carveouts" of its security interests and liens in favor of professionals retained in the Chapter 11 Cases (the "Professional Carveout") including Movant.  The amount of the Professional Carveout was increased each week by the specific amount set forth on agreed upon budgets attached to the cash collateral orders entered in the Chapter 11 Cases.

33.     On November 7, 2011, the Debtors commenced the adversary proceeding captioned *RWJ Management Group, Inc., et. al, v. Atlas Oil Company, et. al*, adversary number 11-02358 (the "Fuel Supply Adversary") in the Chapter 11 Cases after the Debtors' fuel supply was cut off for a few Stations and threatened with respect to others.  After the filing of the Fuel Supply Adversary and continued negotiations with the Fuel Jobbers, the Debtors' fuel supply was continued under pre-Petition Date terms.  The Fuel Supply Adversary is currently pending in the Chapter 11 Cases..

34.     On December 9, 2011, RWJ Downers Grove, RWJ Glen Ellyn, RWJ Romeoville and RWJ Munster filed a joint Motion to Extend the Time to For Unexpired Leases to be Deemed Rejected [**docket no. 218**].  The Court granted the motion and extended the date upon which the Third Party Unexpired Leases and Debtor Unexpired Leases would be deemed

12

rejected pursuant to Section 365(d)(4) of the Code (the "Deemed Rejection Date") through and

including March 23, 2012.

     35.    The Deemed Rejection Date was subsequently extended by separate orders

through June 30, 2013, with respect to RWJ Downers Grove, RWJ Romeoville and RWJ

Munster.

     36.    On December 21, 2012, after the Unexpired Third Party Lease of RWJ Glen Ellyn

had been extended, RWJ Glen Ellyn moved to assume the lease on the RWJ Glen Ellyn Station.

Said motion was heard and continued by the Court through the end of the DIP Period.

     **C.**    **The BP Litigation**

     37.    The Debtors' efforts during the period from the Petition Date until May 2, 2012,

the date of the Trial Court's ruling in the BP Litigation, were focused in large part upon the

prosecution of the BP Litigation and ensuring that the events ongoing in the Chapter 11 Cases

did not impact the Debtors' rights against BP[6].

     38.    On October 14, 2011, the Debtors sought the retention of the BP Litigation

Counsel as special counsel to prosecute the Debtors' rights in connection with the BP Litigation.

On October 19, 2011, the Court entered an order [**docket no. 159**] granting the Debtors' request

and authorizing the employment of the BP Litigation Counsel to continue to prosecute the BP

Litigation.

---

     [6]The development of the Debtors' claims in the BP Litigation to the point of trial warranted the
continuation of the BP Litigation during the Chapter 11 Cases. The Debtors had invested significant
resources in the litigation and had moved past BP's motions for summary judgment. As per the Trial
Court's rulings in the BP Litigation, the Debtors had meritorious claims which if successful could
significantly benefit the Debtors' bankruptcy estates through potential money damages, improved
business terms and avoidance of what the Debtors believed to be unprofitable contracts.

13

39.     Thereafter, the Debtors through their BP Litigation Counsel prosecuted the BP Litigation during the Chapter 11 Cases. The "bench trial" phase of the bifurcated trial in the BP Litigation commenced in November, 2011, and continued over approximately forty (40) days thereafter.

40.     On or about January 9, 2012, the litigants in the BP Litigation formally rested and established a post-trial briefing schedule with respect to the bench trial portion of the litigation. The post-trial briefs and motions were subsequently filed by the parties. The Trial Court then took the matter under advisement.

41.     On May 2, 2012, the Trial Court entered a forty-six (46) page memorandum opinion (the "May Ruling") on the Debtors' claims that were tried in the BP Litigation. The Trial Court entered judgment in favor of BP on all counts of the Debtors' complaint, excluding the claims of RWJ Munster.

42.     Significantly, the Trial Court concluded that the Debtors had satisfied their burden of proof on BP's intent with respect to statements and omissions with respect to the Debtors as well as certain other elements of the Debtors' claims. Unfortunately, the Trial Court also concluded that the Debtors had failed to meet their burden of showing that the Debtors had "relied in fact" upon the statements found by the Trial Court to have been made by BP. Without having proven the element of reliance, the Trial Court concluded, the Debtors' requests for relief had to be denied.

43.     The Debtors disputed the Trial Court's conclusions regarding the reliance finding and filed a motion to reconsider the May Ruling. Ultimately, the Trial Court denied the Debtors' motion for reconsideration, leaving the Debtors with the stark reality that either an appeal of the

14

May Ruling had to be filed, or the rights, claims and interests of BP would remain intact. BP

Litigation Counsel prepared the necessary filings for an appeal of the May Ruling, which were

pending at the end of the DIP Period.

      **D.**    **The Sale Efforts through the End of the DIP Period**

    44.    After a thorough review of the May Ruling was accomplished, and in light of

BMO's position on an RWJ reorganization, the Debtors proceeded with an aggressive marketing

process for the Debtors' property.

    45.    On July 18, 2012, the Debtors' Application for an Order Authorizing

Employment and Retention of Matrix As Debtors' Investment Bankers [**docket no. 438**] was

granted and pursuant thereto, Matrix Private Equities, Inc. ("Matrix")  was retained to assist the

Debtors in carrying out a competitive sale process for the Debtors' assets.

    46.    On August 9, 2012, the Debtors filed a motion seeking, among other things, entry

of an order approving bidding procedures with respect to the proposed sale process [**docket no.

477**] (the "Initial Sale Motion") with the assistance of Matrix.

    47.    On August 20, 2012, BP filed an objection to the Initial Sale Motion [**docket no.

484**] (the "BP Objection") and asserted therein that the use restrictions and related rights of BP

(the "BP Use Restrictions") granted in deeds and other documents between the Debtors and BP

precluded the relief sought by the Debtors.

    48.    The Court denied the relief requested in the Initial Sale Motion, without prejudice

to re-filing the motion with procedures consistent with the Court's observations regarding the

procedural conditions for adjudicating any issues with respect to the BP Use Restrictions.

Unfortunately, the scope of the May Ruling entered in the BP Litigation included expansive

conclusions by the Trial Court (believed by the Debtors to have been unintended) that the BP
Use Restrictions were valid and enforceable. The Debtors would necessarily have to first obtain
the clarification of said conclusions of the May Ruling before Movants could proceed with an
adversary proceeding in the Chapter 11 Cases for the declaration of the scope and extent of the
BP Use Restrictions.

49.    As a result, and in order to proceed with the sale process, on August 31, 2012, the
Debtors filed a renewed sale motion [**docket no. 499**] (the "Renewed Sale Motion") which
preserved the enforceability of the BP Use Restrictions.

50.    On September 7, 2012, an order approving bidding procedures, scheduling an
auction and sale hearing, and approving the form and manner of notices to be provided was
entered. [**docket no. 507**] (the "Approved Bidding Procedures Order").

51.    During the marketing period, the Debtors received written asset purchase
agreements and/or letters of intent from three (3) BP jobbers with purchase prices at or slightly
above the purchase price of $20 million plus inventory for all of the Debtors' assets. The
Debtors also received offers below the $20 million plus inventory price range.

52.    In October, 2012, the Debtors negotiated and entered into an asset purchase
agreement with Buck's, Inc. ("Buck's") to purchase substantially all of the Debtors' assets,
subject to court approval (the "Buck's Offer"). The Buck's Offer included a purchase price in
the amount of $23,750,000 plus the "Inventory Value" and the assumption of certain liabilities,
subject to possible adjustments as more fully described therein. The Buck's Offer was deemed
by the Debtors to be the highest and best offer for the Debtors' assets received as of the date
thereof.

16

53.    On October 17, 2012, pursuant to the Debtors' motion filed on October 12, 2012
[**docket no. 533**] (the "Stalking Horse Motion"), the Court entered that certain Order: (I)
Authorizing Debtors to Enter into Stalking Horse Asset Purchase Agreement; (II) Approving a
Break-up Fee; (III) Amending the Sales Procedures Order of this Court Dated September 6,
2012; and (IV) Granting Related Relief [**docket no. 543**] (the "Stalking Horse Order"). The
auction of the Debtors' assets was to be held on November 28, 2012, and a sale hearing was to
be held on the results of the auction on December 5, 2012.

54.    On October 29, 2012, the Debtors filed an Omnibus Motion For Entry of an Order
Authorizing Assumption and Conditional Assignment of Unexpired Leases of Non-Residential
Real Property and For Related Relief [**docket no. 553**] (the "Lease Assumption Motion"). On
November 12, 2012, BP filed an objection to the Lease Assumption Motion (the "BP
Objection").

55.    On November 21, 2012, the Court granted the Debtors' Motion for Post Petition
Financing and entered that certain Order (I) Authorizing Debtors to (A) Incur Postpetition Debt
Pending a Final Hearing and (B) Grant Adequate Protection and Provide Security and Other
Relief to BMO Harris Bank N. A., and (II) Amending the Final Order Authorizing the Debtor to:
(A) Use Cash Collateral; and (B) Grant Certain Liens and Provide Security and Other Relief to
BMO Harris Bank N. A. [**docket no. 586**].

56.    On December 5, 2012, after several hearings, the Court issued an oral ruling
denying the relief requested in the Lease Assumption Motion for the reasons stated on the record
at the hearing. Thereafter, Movant filed a motion to alter or amend the Court's ruling. BP filed
an objection to this motion. Movant filed a reply brief in support of the motion to alter or amend.

17

57.     Thereafter, on December 11, 2012, the Court granted the Debtors' request for

Post Petition Financing on a final basis and entered that certain Order (I) Authorizing Debtors to

(A) Incur Postpetition Debt and (B) Grant Adequate Protection and Provide Security and Other

Relief to BMO Harris Bank N. A., and (II) Amending the Final Order Authorizing the Debtor to:

(A) Use Cash Collateral; and (B) Grant Certain Liens and Provide Security and Other Relief to

BMO Harris Bank N. A.[**docket no. 604**] (the "DIP Financing Order").  The financing granted in

the DIP Financing Order was extended through the end of the DIP Period pursuant to the entry

of three (3) subsequent extension orders.

58.     In February, 2013, after Buck's had been rejected by BP as an entity eligible to

supply the Debtors' Stations and the Lease Assumption Motion had been denied, the Debtors,

BMO, the Committee and Buck's agreed to the termination of the Buck's Offer and the return of

deposit posted by Buck's in support of its offer.  On March 14, 2013, the Court entered a

stipulation and agreed order  [**docket no. 684**] drafted by Movant approving the settlement of the

parties, including the termination of the Buck's Offer

59.     Subsequently, in February through early March, 2013, Matrix worked to obtain

additional letters of intent and received one from Sassafrasnet, LLC.  Said letter of intent

remained pending at the end of the DIP Period.

### E.      The Appointment of the Chapter 11 Trustee

60.     On February 27, 2013, the United States Trustee filed a Motion to Convert or

Dismiss [**docket no. 664**] in these Chapter 11 Cases at the invitation of the Court.

61.     Also on February 27, 2013, after numerous hearings at which the Court

encouraged the parties to make substantial progress towards a resolution of these Chapter 11

18

Cases, the Debtors presented an order to the Court memorializing the Debtors' agreement with BMO to file a confirmable chapter 11 plan in these Chapter 11 Cases by March 19, 2013.

62.    On March 15, 2013, in light of BMO's conditions on the continued use of cash collateral, the lack of any confirmable Chapter 11 plan and the reality that the Chapter 11 Cases had become essentially become a foreclosure sale process for the Debtors' assets, the Debtors filed the Debtors' Motion to Convert Chapter 11 Cases to Chapter 7 or, In the Alternative, to Dismiss Chapter 11 Cases [**docket no. 690**] (the "Conversion Motion"). Shortly thereafter, BMO not unexpectedly sought the appointment of a Chapter 11 trustee in these Chapter 11 Cases.

63.    On March 20, 2013,  the Court entered an order [**docket no. 712**] granting BMO's request for the appointment of a Chapter 11 Trustee after BMO agreed to fund the administrative expenses associated with maintaining these Chapter 11 Cases in Chapter 11. The Conversion Motion was withdrawn by the Debtors at that time.

64.    On March 27, 2013, an order was entered [**docket no. 732**] granting the U.S. Trustee's Motion for Approval of the Appointment of Philip V. Marteno (the "Trustee") as Chapter 11 Trustee in the Chapter 11 Cases.

65.    On April 10, 2013, the Trustee file an Application to Employ Convenience Management Services, Inc. as Operations Manager to the Trustee in the Chapter 11 Cases [**docket no. 738**]. Thereafter, an order was entered authorizing the employment of Convenience Management Services, Inc. ("CMS"), pursuant to which CMS took up the operations of the Debtors' Stations.

19

66. On April 14, 2013, the Trustee filed a Motion to Authorize the Trustee to enter into and perform under Fuel Supply Agreements with Graham Enterprises, Inc., [**docket no. 744**], which was granted on April 17, 2013.

67. Also on April 14, 2013, the Trustee filed a Motion to Reject Executory Contracts [**docket no. 743**] and therein sought the rejection of the Debtors' fuel supply arrangements with Atlas and Parent. The Trustee's motion was granted on April 17, 2013.

68. On June 5, 2013, the Trustee filed his Motion for Entry of Order (i) Establishing Bidding Procedures, Including Certain Bid Protections; (ii) Approving Break-Up Fee; (iii) Approving Form of Asset Purchase Agreement; (iv) Scheduling an Auction and a Subsequent Sale Hearing in Connection with the Sale of the Debtors' Assets Pursuant to 11 U.S.C. §§ 105 and 363; (v) Setting Certain Deadlines in Connection Therewith, and (vi) Granting Related Relief [**docket no. 800**]. The Trustee's sale procedures motion was subsequently granted.

69. On June 18, 2013, the Trustee filed a notice regarding the status of bidding [**docket no. 823**] and indicated therein that Graham was the only bidder.

70. On June 26, 2013, the Court entered an Order bidding [**docket no. 849**] approving the sale of substantially all of the Debtors' assets to Graham.

71. On July 30, 2013, the Trustee filed his Report of Sale [**docket no. 872**] and therein indicated that the Trustee had received approximately $20,792,987 in sales proceeds and $39,000.00 in certain cost reimbursements at the closing on the sale of substantially all of the Debtors' assets to Graham (the "Graham Asset Sale").

20

72.    As addressed more fully in Section IV(I) infra, Movant assisted the Trustee when

requested throughout the post-DIP Period to support a smooth transition for the benefit of the

Debtors' bankruptcy estates.

## III.   INTERIM COMPENSATION PAID TO
## MOVANT AND BMO LIEN CARVEOUTS APPROVED
## DURING THE DIP PERIOD

73.    Pursuant to the Interim Compensation Order, Movant has filed fourteen (14)

monthly interim statements in these cases.

74.    Payments requested and Monthly Payments received by Movant pursuant to the

Interim Compensation Order may be summarized as follows:

| Request/ Month(s) [Doc. No.] | Fees Incurred | Fees Received | Costs Incurred | Costs Received | Total Received | Balance Unpaid |
|---|---|---|---|---|---|---|
| 8/11 - 9/11 [204] | $223,578.00 | $201,220.20 | $20,397.44 | $20,397.44 | $221,617.64 | $22,357.80 |
| 10/11 [219] | $149,519.50 | $134,567.56 | $1,339.40 | $1,339.40 | $135,906.96[7] | $14,951.94 |
| 11/11 - 2/12 [379] | $296,193.00 | $266,573.70 | $3,565.60 | $3,565.60 | $270,139.30 | $29,619.30 |
| 3/12 [439] | $38,007.00 | $34,206.30 | $283.76 | $283.76 | $34,490.06 | $3,800.70 |
| 4/12 [444] | $67,324.00 | $60,591.60 | $164.83 | $164.83 | $60,756.43 | $6,732.40 |
| 5/12 [445] | $65,486.00 | $58,937.40 | $86.22 | $86.22 | $59,023.62 | $6,548.60 |
| 6/12 [478] | $82,726.00 | $74,453.40 | $448.24 | $448.00 | $74,901.40 | $8,272.84 |
| 7/12 [527] | $93,853.00 | $84,467.70 | $111.71 | $111.71 | $84,579.41 | $9,385.30 |
| 8/12 [528] | $114,524.00 | $103,071.60 | $370.90 | $370.90 | $103,442.50 | $11,452.40 |
| 9/12 [571] | $145,615.00 | $131,053.48 | $214.36 | $214.36 | $131,267.84 | $14,561.52 |
| 10/12 [595] | $166,622.00 | $149,775.80 | $2,273.67 | $2,273.67 | $152,049.47[8] | $16,846.20 |

---

[7] Includes partial application ($83,187.50) of the advance prepayment.

[8] Includes partial application ($11,812.50) of the advance prepayment.

| 11/12 [**666**] | $97,643.00 | $0.00 | $483.85 | $0.00 | $0.00 | $9,764.30 |
| 12/12 [**673**] | $83,466.00 | $0 | $992.70 | $0.00 | $150,000.00 (paid by the Trustee) | $8,346.60 |
| 1/13 [**676**] | $79,460.00 | $0 | $127.01 | $0.00 | $50,000.00 (paid by the Trustee) | $44,061.66 |
| **TOTAL** | **$1,704,016.50** | **$1,298,918.74** | **$30,859.69** | **$29,255.89** | **$1,528,174.63**[9] | **$206,701.56** |

75.    Copies of the supporting statements of services rendered and costs incurred for each of the above months are attached hereto as Schedules A through G and addressed more fully in Section IV of this Application.

76.    Further, the approved aggregate amount of the Professional Carveout attributable to Movant as set forth in the Final Cash Collateral Order, the extended cash collateral orders and the BMO financing orders entered in the Chapter 11 Cases is $1,773,500.00.  Attached hereto as **Exhibit 1** and made a part hereof is a schedule identifying all of Movant's individual Professional Carveout amounts approved pursuant to cash collateral orders entered in the Chapter 11 Cases.

77.    Currently, the Trustee is holding the sum of $306,116.00 with respect to "unused" Professional Carveout attributable to Movant, which was taken from proceeds recovered from the Debtors' assets through the Graham Asset Sale and from cash-flow generated by the Debtors' operations prior to the sale.

## IV.
## LEGAL SERVICES RENDERED

78.    As stated, this is the first application for compensation and expense reimbursement filed  by Movant in the Chapter 11 Cases.  For ease of reference, Movant has identified and set

---

[9] Includes application of the advance prepayment ($95,000.00).

forth eight (8) categories of legal services for which compensation is sought herein: (1)

Administrative Matters; (2) Cash Collateral/DIP Financing Matters; (3) Executory Contracts and

Unexpired Leases; (4) Plan of Reorganization Matters; (5) BP Matters; (6) Fuel Supply Litigation;

(7) Asset Sale Efforts; and (8) Fee Petition Preparation.  Each category contains a narrative of the

matters involved; a general description of the tasks performed; detailed time records in

chronological order, with each attorney's time described therein, the nature and purpose of such

entries; and the result achieved or benefit to the estate, as required by In re Wildman, 72 B.R. 700

(Bankr. N.D. Ill. 1987); In re Pettibone Corporation, 74 B.R. 293 (Bankr. N.D. Ill. 1987); and

Matter of Continental Illinois Securities Litigation, 962 F.2d 566 (7th Cir. 1992).

79.    To facilitate the review and assessment by the Court of the overall reasonableness

of the fees incurred by Movant during the DIP Period, and the benefits conferred thereby, Movant

has summarized the hours expended and the fees incurred during the DIP Period in the Chapter 11

Cases as follows:

**DIP Period**
**(August 26, 2011 - March 27, 2013)**

| **DESCRIPTION** | **TOTAL HOURS** | **TIME VALUE** | |
|---|---|---|---|
| A.  Administrative Matters | 1223.3 | $ | 441,613.50 |
| B.  Cash Collateral/DIP Financing | 1078.7 | $ | 410,591.50 |
| C.  Executory Contracts and Unexpired Leases | 726.3 | $ | 270,642.50 |
| D.  Plan of Reorganization | 362.3 | $ | 142,338.00 |
| E.  BP Matters | 330.9 | $ | 127,289.50 |
| F.  Fuel Supply Litigation | 416.9 | $ | 141,170.50 |
| G.  Asset Sale Efforts | 740 | $ | 288,938.00 |
| H.  Fee Petition Preparation** | 171.10 | $ | 35,194.00 |
| **TOTAL** | 4878.4 | $ | 1,857,777.50 |

23

\*\*Reduced to 2% of the total compensation sought.

80. Further, Movant has not treated the Debtors individually for purposes of the categorization set forth above and in the descriptions to follow. The approach set forth herein is consistent with the approach taken in the Chapter 11 Cases with respect to the purchase and use of fuel, the handling of motor fuel sale receipts, the use of cash collateral, the sale of the Debtors' assets and other matters involving the Debtors. As a result the handling of the Debtors matters in this manner, the significant duplication of efforts and the corresponding expense from performing the same tasks with respect to the same parties, including creditors, multiple times has been avoided for the benefit of the Debtors' bankruptcy estates.

81. Further, while Movant has categorized its efforts by matter as set forth above, it cannot be overstated that the claims and rights of BMO, the Debtors' largest secured and unsecured creditor, and BP permeated all aspects these Chapter 11 Cases. As stated, the potential value to the Debtors' bankruptcy estates of the claims alleged in the BP Litigation at the point that the Chapter 11 Cases were filed was significant. The BP Litigation had essentially proceeded through summary judgment and the Debtors were preparing for trial. A jury trial was to be set on the Debtors' claims with respect to RWJ Munster. The Debtors understood that if the Debtors were not successful in the BP Litigation, the value of the Debtors' assets would likely not exceed the amount of BMO's indebtedness. The May Ruling clarified these positions, albeit in a manner not favorable to the Debtors' estates.

82. With Movant's assistance, the Debtors spent nineteen (19) months before and after the May Ruling seeking a consensual plan of reorganization and, subsequently, the sale of substantially all of their assets, with the direct involvement of BMO. Unfortunately, due in large

24

part to the results at the trial court level in the BP Litigation and the parameters required by BP with respect to the supply of BP branded fuel, the asset sale process could not generate the range of purchase prices otherwise acceptable to BMO at the time. Movant nonetheless assisted in a full marketing effort of the Debtors' assets in an attempt to bridge the gap between BMO's undersecured claims and BP's restrictions all the way through to the end of the DIP Period. The status of the Chapter 11 Cases in existence when the Trustee took over were vastly improved from the cases that the Debtors were handed when their bank accounts were frozen in August, 2011.

83. Movant has acted as consultant, negotiator, arbitrator, analyst, draftsman and legal advisor. Movant guided the Debtors through numerous issues which arose during the DIP Period. As more fully set forth below, Movant expended significant efforts throughout the entire DIP Period, endeavoring at all times to maximize the value of all assets in these estates for the benefit of all creditors and to minimize the expenses incurred in connection therewith.

## A. ADMINISTRATIVE MATTERS

### Services Rendered During the DIP Period

| Attorney | Hours | Rate | Value |
|---|---|---|---|
| MAC | 508.70 | $400/$430 | $ 217,253.00 |
| JB | 25.00 | $125/$135 | $ 3,305.00 |
| SBC | 500.10 | $295/$300 | $ 149,627.00 |
| CHG | 3.20 | $460 | $ 1,472.00 |
| RDR | 19.50 | $265/$300 | $ 5,797.50 |
| NQR | 133.80 | $370/$400 | $ 50,259.00 |
| HLA | 23.90 | $460 | $ 10,994.00 |
| HBM | 1.10 | $460 | $ 506.00 |
| ESB | 6.20 | $300 | $ 1,860.00 |

25

| Attorney | Hours | Rate | Value |
|----------|-------|------|-------|
| AFB | 1.80 | $300 | $ 540.00 |
| TOTAL | 1,223.3 | | $ 441,613.50 |

84.    Movant expended 1,223.3 hours during the during the DIP Period in connection
with the performance of debtor in possession duties under Section 1107 of the Code and the
numerous administrative matters arising herein (see **Schedule A** attached hereto).  With respect to
this category of services, Movant seeks allowance of the total amount set forth above and payment
in the amount of: (a) $47,718.55 remaining unpaid for services rendered during the period of
August 26, 2011, and January 31, 2013; plus (b) $46,178.00 for services rendered to the extent of
121.3 hours[10] during the period of February 1, 2013, through March 27, 2013. *See*, Schedule
A.[11] The hourly rates set forth above and in the attached Schedule A are consistent with Movant's
hourly rates set forth in the A&G Engagement Letter.

As is evident from the attached detail, the many efforts rendered by Movant in this
category include:

(i)    "First Day" Motions.  At the onset of the Chapter 11 Cases, Movant assisted the
Debtors in the preparation and filing of various emergency motions necessary to
enable the Debtors to continue their operations and preserve the Debtors' assets for
the benefit of their creditors. Movant also assisted the Debtors' principal in
preparing and filing a lengthy and detailed declaration setting forth the events

---

[10]Movant spent approximately 60 hours and incurred approximately $22,817.00 in fees discussing
with the Debtors and preparing, filing and prosecuting the Conversion Motion which are not included in
the amounts above or the supporting detail attached as Schedule A.  As an accommodation to the Debtors'
estates, Movant is voluntarily waiving any right to seek recovery of such compensation.

[11] Movant also seeks allowance of ordinary and necessary expenses incurred in connection
therewith in the amount of $30,859.69 (see **Schedule J** attached hereto) and allowance and payment of
$1,040.78 in expenses remaining unpaid for the period of February, 2013, through March 27, 2013.

26

leading up to the Chapter 11 Cases and other information in support of these
motions.

a.　Joint Administration Motion [**docket no. 8**] - To avoid duplication
of expenses and efforts by the Debtors, their creditors and the Court,
to minimize confusion amongst creditors, and to facilitate the
administration of the Chapter 11 Cases, Movant sought and obtained
the entry of an order providing for the joint administration of the
Chapter 11 Cases.

b.　Cash Management System Motion [**docket no. 10**] - To enable
seamless operations, minimize any disruptions and avoid
unnecessary expenses to the estates, Movant sought and obtained the
entry of an order which authorized the Debtors to maintain their
existing bank accounts, to continue to use their existing cash
management system, business forms, and books and records and
which waived the investment and deposit requirements of Section
345(b) of the Code.

c.　Pre-Petition Wage Motion [**docket no. 11**] - To ensure that the
Debtors' employees remained with the Debtors at the onset of these
Chapter 11 Cases, Movant assisted the Debtors in obtaining court
authority to pay the Debtors' employees certain pre-petition wage
claims which accrued during the approximate 3 week period prior to
the filing of the Chapter 11 Cases. Such efforts were essential to
maintaining employee morale and cooperation in the transition to
operating under the constraints of the Code.

d.　Fuel Service Motion [**docket no. 16**] - In light of the manner in
which fuel is supplied to the Debtors' motor fuel locations and to
ensure on-going deliveries, Movant assisted the Debtors in filing a
motion which sought authority to continue processing payment for
fuel supplies and to pay certain prepetition fuel obligations in
connection therewith. This motion was continued and ultimately
withdrawn.

e.　Critical Vendor Motion [**docket no. 20**] - Movant assisted the
Debtors in preparing and filing a motion and obtaining authority to
pay certain prepetition obligations with respect to alcohol
distributions and secured future deliveries from the distributors.
Absent such, the Debtors' alcohol distributors would not have
delivered product to the Debtors' locations thereby negatively
impacting future sales. Movant spent considerable time making

27

phone calls to the Debtors' alcohol distributors to ensure alcohol
deliveries would be forthcoming.

(ii)    Preparation of Schedules. Shortly after the commencement of these Chapter 11
        Cases, Movant determined that it and the Debtors would be unable to cull through
        the Debtors' records in sufficient time to file the Bankruptcy Schedules within the
        statutory deadline, and Movant therefore prepared and filed a motion seeking to
        extend the time for the Debtors to file their Bankruptcy Schedules and Statements
        of Financial Affairs (collectively, the "Schedules and SOFA"). Movant spent
        considerable time working with the Debtors to prepare and file the Schedules and
        SOFA and timely filed them within the extended period granted by the Court.
        Subsequent to filing the Schedules and SOFA, in September 2011, Movant obtained
        updated information and recognized that it was incumbent upon the Debtors to
        amend their Schedules and SOFA. Accordingly, in mid October 2011, Movant
        assisted the Debtors in preparing and filing amended Schedules and SOFA.

(iii)   Creditor Inquiries and Initial Post-Filing Obstacles. Movant promptly responded to
        the inquiries of creditors and other parties in these Chapter 11 Cases questioning the
        causes for the Chapter 11 filing, the impact on and filing of their claims, the
        continuation of the Debtors' business, and many other matters. In Movant's many
        years of experience representing debtors in chapter 11 cases, Movant has found that
        a prompt and complete response to parties requesting information engenders a
        cooperative spirit, which, in turn, results in fewer and less costly proceedings, and
        enhances the prospects for a successful reorganization. To accomplish this,
        however, it is necessary to give parties who call the requisite time to convey the
        fact that the Debtors' representatives are doing everything they can to bring a
        successful and prompt conclusion to the cases. Invariably, this fosters a more
        expeditious and cost effective reorganization effort. In addition, at the onset of
        these Chapter Cases Movant addressed a variety of issues with vendors,
        distributors, payroll company, lottery and liquor commissions, water departments
        and taxing authorities, among others, to minimize any disruptions resulting from the
        filing of these Chapter 11 Cases.

(iv)    Retention of Professionals. Movant prepared and/or assisted in the preparation of
        all necessary court documents (i.e. motions, notices of motions, affidavits) in
        connection with obtaining authorization for the estates to employ various
        professionals, including:

        a.    Movant - to represent the Debtors generally and advise them with
              respect to their duties as debtors in possession.

        b.    RSM McGladrey, Inc. - as financial advisors to the Debtors.
              Movant assisted the Debtors in interviewing several financial
              advisors before RSM McGladrey was selected. Movant also

                                        28

reviewed the Committee's request to employ a separate financial advisor. To avoid what the Debtors deemed to be unnecessary expenses associated with having multiple financial advisors, Movant prepared and filed an objection to the Committee's request and thereafter negotiated a resolution which provided for the employment of a separate financial advisor for the Committee with an initial cap of $25,000 for services rendered by the Committee's financial advisor, absent subsequent agreement by the parties or further court order.

c.  Foran, O'Toole & Burke LLC - as special counsel to represent the Debtors on a contingency fee basis in three (3) condemnation proceedings commenced by the Illinois Department of Revenue.

d.  Campbell Accounting, LLC - as accountants for the Debtors. Campbell Accounting provided accounting services to the Debtors for several years prior to the filing of the Chapter 11 Cases and their detailed institutional knowledge was instrumental in minimizing expenses.

e.  Matrix Private Equities, Inc. - as investment bankers to assist in the marketing and sale process of the Debtors' assets. Once again, Movant spent significant time interviewing several investment bankers and negotiating the terms of retention. Movant consulted with the Committee and BMO throughout this process and had numerous telephone conversations and exchanged multiple e-mails with counsel for BMO with respect to the selection of the investment banker to be retained as well as the terms of such engagement. With the support of the Committee and BMO, Matrix was retained. Several months prior to employing Matrix, Movant and the Debtors spent considerable time with Variant Capital Advisors, LLC, Conway MacKenzie, Inc. and Concord Financial Advisors, LLC in contemplation and connection with the possibility of retaining these entities as investment bankers. Movant had prepared an application to employ such entities along with the necessary documents, though such application was never presented as a result of BMO waiving its prior requirement that the Debtors employ an investment banker at that time and the subsequent decision to proceed with the retention of Matrix.

(v)  Operating Reports. Movant worked with the Debtors and their professionals in the preparation and filing of the debtor in possession operating reports. In addition, Movant discussed with the Debtors the calculation of the UST's quarterly fees and followed up with the Debtors to ensure the payment thereof, accompanied by the

29

quarterly fee statements evidencing the calculation of these payments. Movant also reviewed with the Debtors' representatives the UST's Operating Instructions for all chapter 11 debtors to provide for the requisite understanding of the chapter 11 requirements.

(vi)    Meetings of Creditors. Movant prepared for and attended a meeting with the Debtors and the UST's office to discuss generally the Debtors' obligations as debtors in possession. Movant also prepared for and attended both the meeting of the Debtors' 20 largest creditors and the first meeting of creditors.

(vii)   Ongoing Coordination of Efforts with UST. Movant contacted the UST to discuss the nature and purpose of certain motions and to obtain the input of the UST. Movant made a conscious effort to provide the UST with updates on matters arising in the Chapter 11 Cases and believed that working closely with the UST enabled Movant to gain valuable insights and comments. For example, the UST provided Movant comments with respect to the proposed indemnification language for the engagement of the Debtors' financial advisors which Movant revised and which helped facilitate and expedite the retention. As another example, Movant elicited the UST's input with respect to the proper manner to disclose in the debtor-in-possession reports the cash receipts generated from credit card proceeds in light of the unique situation in which credit card proceeds are handled by the Debtors' fuel suppliers and BP.

(viii)  Interim Compensation Order. Movant negotiated the Interim Compensation Order with the Committee and prepared and filed a joint motion with the Committee to establish procedures which provided the ability of the Debtors' and the Committee's court approved professionals to render services without the financial burden that would have existed given the sizable amount of efforts required during the Chapter 11 Cases. Movant also assisted professionals retained by the Debtors in preparing and filing monthly statements in compliance with the Interim Compensation Order.

(ix)    Utilities Motion. Movant prepared and filed the necessary adequate assurance motion in order to ensure the uninterrupted flow of the various utility services to the Debtors' ten (10) motor fuel locations. An objection to the Utilities Motion was filed by Exelon Energy Company. The motion was continued and a trial order was set to resolve Exelon's objection. Movant was able to resolve the objection of Exelon without the need for discovery or a trial and an order was entered by agreement with Exelon.

(x)     Condemnation Proceedings. Prior to the Petition Date, IDOT had filed a complaint for condemnation with respect to the Debtors' Plainfield location (the "Plainfield Condemnation Action"). Shortly after the Petition Date, in September 2011, IDOT filed a complaint for condemnation with respect to the Debtors' Yorkville location

30

(the "Yorkville Condemnation Action"). In November 2011, IDOT filed a complaint for condemnation with respect to the Debtors' Glen Ellyn location (the "Glen Ellyn Condemnation Action"). As set forth above, Movant assisted the Debtors in retaining special counsel to continue representing the Debtors with respect to these matters. Movant continuously followed up with special counsel as to the progress of the condemnation actions and kept counsel for BMO apprised of the status. Movant assisted special counsel in resolving both the Yorkville and Glen Ellyn Condemnation Actions. Specifically, Movant negotiated a resolution with counsel for the landlord of the Glen Ellyn location. Movant obtained and incorporated comments from both the Committee and BMO with respect to the proposed settlement. Movant prepared and filed a motion seeking the entry of an order approving the settlement and compromise in accordance with Rule 9019 of the Bankruptcy Rules. Movant also coordinated and negotiated a resolution of the Yorkville Condemnation Action and helped craft a proposed agreed judgment order consented to by IDOT and BMO. This settlement has resulted or will result in the payment of $270,000 to the benefit of the estates. Movant also prepared and filed the appropriate motion seeking the entry of an order approving this proposed settlement and compromise in accordance with Rule 9019. Both settlement motions were granted without objection.

(xi)     Exclusivity Motions. In December 2011, while the Debtors were contemplating a settlement with BP of the BP Litigation and preparing for a trial in the event a settlement was not forthcoming, Movant prepared and filed a motion seeking to extend the exclusive period in which only the Debtors could file a plan of reorganization and disclosure statement (the "Exclusivity Period"). BMO filed a limited objection to this motion, essentially requesting the Exclusivity Period not be extended as it pertains to BMO. Movant prepared and filed a reply in support of the motion to extend the Exclusivity Period and the motion was granted thereby extending the Exclusivity Period to April 23, 2012. Thereafter, the BP Litigation went to trial and a ruling was anticipated to come on or about May 2, 2012. In large part, based upon the expected timing and impact of the ruling, Movant filed a second motion to extend the Exclusivity Period and the Court entered an order extending same to May 31, 2012. Thereafter, while the Debtors continued to review the ruling issued in the BP Litigation and continued to negotiate alternatives with BMO for a resolution of these Chapter 11 Cases, Movant filed a third motion to extend the Exclusivity Period and the Court entered an order extending the Exclusivity Period to July 1, 2012. Movant prepared and filed a fourth motion to extend the Exclusivity Period. The Court continued the hearing on this motion from June 27, 2012 to July 3, 2012 and entered an order extending the Exclusivity Period to July 3, 2012. On July 3rd, the Court continued the motion and further extended the Exclusivity Period to July 10th. At the July 10th hearing, the Court denied the request to further extend the Exclusivity Period.

31

(xii) <u>Bar Date Motion</u>. Movant prepared and filed the necessary motion and related
documents to set a bar date for filing claims in the Chapter 11 Cases in order to
facilitate a prompt and successful conclusion to these cases. Movant assisted the
Debtors in having the requisite notice of the bar dates published in the Chicago
Tribune.

(xiii) <u>Employee Related Matters</u>. In an effort to retain and incentivize key non-insider
employees throughout the anticipated sale process and preserve the value of the
estates, Movant assisted the Debtors in formulating a retention bonus/severance
plan. Movant prepared the motion to approve this plan along with the
accompanying exhibits. The Committee filed an objection to the proposed plan. In
an effort to reach an agreement with respect to the proposed plan and avoid a
contested hearing, Movant had numerous discussions and negotiated revisions to
the plan with counsel for the Committee, BMO and the UST. After several
revisions to the proposed plan, Movant was successful in obtaining the entry of an
order approving a retention bonus/severance plan for critical employees without
objection of BMO, the Committee or the UST.

(xiv) <u>Case Maintenance</u>. Movant addressed and handled numerous other miscellaneous
tasks required for the Debtors' operations and compliance with their duties and
obligations as debtors in possession throughout these cases. For example, Movant
spent significant time addressing insurance related matters and proper handling of
issues related to contaminated gas which was or may have been delivered to the
Debtors' Stations and thereafter sold to the Debtors' customers.

(xv) <u>Document Production and Information Requests</u>. Movant assisted the Debtors in
responding to and facilitated the transmission of numerous documents and other
information requested by BMO with respect to its collateral from time to time
throughout these cases. Movant believed it was important to provide such
information to BMO in as prompt and efficient manner as possible without
interrupting the Debtors' regular business operations. With Movants' assistance,
the Debtors provided voluminous records and other financial information requested
by BMO in very short time periods, including weekly financial information.

(xvi) <u>Claims Review and Analysis</u>. Movant reviewed all claims filed against each of the
twelve (12) Debtors and prepared a detailed summary analysis. Movant worked
closely with the Debtors' management team and attended a lengthy meeting at the
Debtors' headquarters to review, update and revise the claims analysis.

85. As reflected in the foregoing summaries, Movant performed extensive services in

this category to facilitate the fulfillment of the duties imposed upon the Debtors in the Chapter 11

Cases and to otherwise satisfy the administrative obligations and functions of a debtor in

32

possession. Movant believes that in light of the definitive results reflected herein, the services

rendered in this category were warranted, reasonable and benefitted the Debtors' bankruptcy

estates.

86.     Movant also worked with the Debtors on a process to address the stale mate

encountered by the Debtors in February and March, 2013. Prior to the filing of the Conversion

Motion, Movant was faced with BMO's continued demands for the employment of a chief

restructuring officer without having presented the Debtors with any Chapter 11 plan which could

be confirmed. The Debtors were not willing to consent to a chief restructuring officer being

appointed in the Chapter 11 Cases in part because of the costs related to any newly appointed

restructuring officer effectively running the Debtors in possession after nineteen (19) months of

case administration and no viable Chapter 11 plan on the table. At that point, these Chapter 11

Cases were essentially asset foreclosure proceedings for the benefit of BMO.

87.     Accordingly, Movant prepared and filed the Conversion Motion as a means of

pressing all parties to a achieve a solution and at worst causing the appointment of a full powered

trustee. In the thirty (30) years of Movant's existence, Movant had never filed a motion to convert

while its Chapter 11 debtor client continued to operate its business. More importantly, the Debtors

and their management had done absolutely nothing wrong and their conduct did not support the

appointment of a Chapter 11 trustee for cause. Yet, the circumstances left the Debtors and Movant

with no other options - a trustee was the only option left. The filing of the Conversion Motion was

followed by BMO's filing of the motion for the appointment of a Chapter 11 trustee, which was

fully expected by Movant. The hearing on BMO's Chapter 11 trustee motion was relatively short

and essentially uncontested.

88.    Although most of the time spent by Movant with respect to the Conversion Motion

has been purged from Schedule A and for which compensation is not sought herein, Movant's

efforts benefitted the Debtors' estates by moving the Chapter 11 Cases forward beyond the

impasse and resulted in BMO acknowledging at the hearing on the appointment of a Chapter 11

trustee that BMO would remain responsible for the costs of administration in these Chapter 11

Cases.

## B. CASH COLLATERAL/DIP FINANCING

### Services Rendered During the DIP Period

| Attorney | Hours | Rate | Value |
|---|---|---|---|
| MAC | 642.40 | $400/$430 | $ 270,735.00 |
| JB | 4.10 | $135 | $ 512.50 |
| SBC | 352.80 | $295/$300 | $ 105,676.00 |
| CHG | 23.30 | $460 | $ 10,718.00 |
| RDR | 0.20 | $265/$300 | $ 53.00 |
| NQR | 32.40 | $370/$400 | $ 12,087.00 |
| HLA | 10.20 | $460 | $ 4,692.00 |
| HBM | 13.30 | $460 | $ 6,118.00 |
| TOTAL | 1078.7 | | $ 410,591.50 |

89.    Movant expended 1078.7 hours during the DIP Period on cash collateral and DIP

financing matters (see **Schedule B** attached hereto).  With respect to this category of services,

Movant seeks payment in the amount of: (a) $43,698.85 remaining unpaid for services rendered

during the period of August 26, 2011, and January 31, 2013; plus (b)$11,603.00, for services

rendered to the extent of 32.9 hours during the period of February 1, 2013, through March 27,

34

2013. *See*, Schedule B. The hourly rates set forth above and in the attached Schedule B are
consistent with Movant's hourly rates set forth in the A&G Engagement Letter.

        **(i)**    **Cash Collateral**

    90.    During the nineteen (19) months of the DIP Period, the Court entered thirty-six (36)
separate orders regarding the use of cash collateral and/or DIP Financing, not including several
trial orders with respect to contested cash collateral hearings (occurring prior to the entry and
approval of the Professional Carveout). Movant struggled to continuously obtain the consensual
use of cash collateral throughout the DIP Period and heavily negotiated the terms for DIP
Financing which provided significant benefits to the estates and their creditors.

    91.    In order to allow for the continued operations of the Debtors' businesses and
preserve value for the benefit of their creditors, at the onset of these Chapter 11 Cases, Movant
immediately sought the use of cash collateral on an emergency basis. Movant received a proposed
order from counsel for BMO with respect to the use of cash collateral by consent. Movant
promptly reviewed the proposed order and commenced negotiations regarding the terms thereof.

    92.    At the same time the parties were negotiating the terms for use of cash collateral by
consent, Movant was preparing the motion to be filed seeking the required relief on an emergency
basis. On August 31, 2011, the relief requested was granted in part and an order authorizing the
use of cash collateral by consent of BMO and continuing the motion to September 7, 2011, for
further hearing was entered. Though the use of cash collateral was ultimately agreed to by consent
of BMO, Movant spent significant time negotiating terms for proposed orders, attending numerous
hearings, preparing for contested trials, addressing discovery propounded by BMO, including
preparing for and attending several depositions, producing voluminous records and documents,

35

preparing detailed exhibit and witness lists, compiling exhibits consistent with the Court's trial orders, and preparing and filing motions in limine.

93.     In addition, early in the Chapter 11 Cases, Movant had to address issues raised by objections filed by both BMO and the Committee, before ultimately reaching terms on an agreement for the entry of a heavily negotiated final order authorizing the use of cash collateral, which was entered on October 25, 2011. However, even after the entry of this order, Movant continued to face stiff negotiations with respect to both the length of future cash collateral orders and various conditions which BMO sought to impose upon the Debtors in exchange for the continued use of cash collateral and Movant again had to prepare exhibit and witness lists and prepare for a hearing in early January 2012.

94.     As a result, Movant was constantly addressing budget issues and negotiating (what inevitably ended up being short term) orders while often simultaneously having to prepare for a contested hearing should the matter not be resolved by consent. In addition, the constant attention required to obtaining consensual use of cash collateral necessarily distracted and delayed both Movant and the Debtors from their efforts towards accomplishing certain other case and operational matters.

**(ii)     DIP Financing**

95.     After nearly fourteen (14) months following the filing of the Chapter 11 Cases, the Debtors determined that they would no longer be able to support their operations by the use of cash collateral alone. Post-petition financing would be required. As is typical in Chapter 11 Cases, BMO prepared the initial draft of a proposed debtor in possession financing order. Movant

36

closely reviewed same and believed that certain aspects of the proposed order had to be modified
for the Debtors to proceed in the best interest of their creditors.

96.    Significantly, Movant believed that it would not be fair to have a situation whereby
the Debtors would either incur trade debt pursuant to a budget approved by BMO and then, in the
event that funding was terminated or a sale was consummated, not have the funding available to
satisfy those trade creditors whose claims were budgeted and actually incurred or otherwise be left
with administratively insolvent estates unable to pay agreed upon employee bonuses or other
necessary administrative expenses associated with closing the Chapter 11 Cases.

97.    Difficult negotiations ensued between Movant and counsel to BMO, but Movant
was ultimately successful in obtaining provisions in the DIP Financing Order which allowed for
the continued use of cash collateral and the ability to incur post-petition debt during the crucial
"run-off period" after the termination date of the order for: (i) all accrued but unpaid amounts in
the Budget incurred through the termination date; (ii) all accrued but unpaid Professional Carveout
amounts for the court approved non-insider retention bonuses and severance pay; and (iii) certain
Professional Carveout amounts for professionals of the Debtors and the Committee.[12]

98.    More importantly, Movant negotiated for and obtained provisions in the DIP
Financing Order providing for additional carveouts from the proceeds of a sale of the Debtors'
assets for the payment of allowed administrative expenses and unsecured claims  - i.e "runoff
costs" - in amounts which could, in the aggregate, exceed $900,000 depending upon the ultimate
results of the sale.

_____

[12] Some of these protections were previously negotiated and approved in the context of the prior
cash collateral orders.

99. Movant prepared a motion providing all the pertinent disclosures required by the

Code and the local rules of this Court and was successful in obtaining the entry the DIP Financing

Order on November 21, 2012, on an interim basis and on December 11, 2012, on a final basis.

Through Movants efforts on behalf of the Debtors, the DIP Financing Order was later extended

pursuant to three (3) subsequent extension orders through the end of the DIP Period.

## C. EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### Services Rendered During the DIP Period

| Attorney | Hours | Rate | Value |
|----------|-------|------|-------|
| MAC | 404.80 | $430 | $ 174,064.00 |
| JB | 2.10 | $135 | $ 262.50 |
| SBC | 138.90 | $300 | $ 41,670.00 |
| CHG | 0.50 | $460 | $ 230.00 |
| RDR | 12.20 | $300 | $ 3,660.00 |
| HLA | 2.60 | $460 | $ 1,196.00 |
| AFB | 165.20 | $300 | $ 49,560.00 |
| TOTAL | 726.3 | | $ 270,642.50 |

100. Movant expended 726.3 hours during the DIP Period on lease assumption matters,

fuel supply matters and related executory contract matters (see **Schedule C** attached hereto). With

respect to this category of services, Movant seeks allowance of the total amount set forth above

and payment in the amount of (a) $26,038.45 remaining unpaid for services rendered during the

period of August 26, 2011, and January 31, 2013; plus (b) $10,258.00, for services rendered to the

extent of 27 hours[13] during the period of February 1, 2013, through March 27, 2013. *See*, Schedule

---

[13]Movant spent approximately 85.30 hours and incurred approximately $30,166.00 in fees
discussing with the Debtors and preparing, filing and preserving an appeal of the order denying the Lease
Assumption Motion, which Movant has voluntarily waived as an accommodation to the Debtors'
bankruptcy estates. The fees for such services are not included in the amounts above and the

C. The hourly rates set forth above and in the attached Schedule C are consistent with Movant's
hourly rates set forth in the A&G Engagement Letter.

  **(i)  Unexpired Lease Matters**

  101.  Early in the Chapter 11 Cases while the Debtors, Movant prepared and timely filed
a motion seeking to extend, for cause, the Deemed Rejection Date pursuant to Section 365(d)(4) of
the Code. The Court granted the motion and extended the Deemed Rejection Date for an
additional 90 days, through and including March 23, 2012.

  102.  As the March 23rd 2012, deadline was approaching, Movant determined it would be
necessary to either obtain a further extension of the Deemed Rejection Date or assume the Third
Party Unexpired Leases so as not to risk losing the ability to continue operating at the Debtors'
four (4) leased locations. Movant reached out to the landlords (or their counsel) for each of these
locations in an effort to obtain an agreement to extend the Deemed Rejection Date. Movant
drafted written consent forms to be executed by the landlords in the event an agreement to extend
the Deemed Rejection Date could be reached. While Movant continued to obtain consents from
their landlords,' on March 14, 2012, Movant filed a motion seeking, among other things, to
assume the Third Party Unexpired Leases, and in the alternative to extend the Deemed Rejection
Date should the landlords consent to same.

  103.  On March 19, 2012, BP filed an objection to the Debtors' request to assume the
Third Party Unexpired Leases alleging that the Debtors failed to provide for the cure of all defaults
under these leases and failed to demonstrate adequate assurance as required by Section 365(b) of
the Code. Prior to the hearing on March 21, 2012, Movant successfully obtained written consents

---

corresponding time entries have been purged from the supporting detail attached as Schedule C.

to extend the Deemed Rejection Date from each of the four (4) landlords. Movant prepared, and by stipulation and agreement of the landlords, the Debtors, BP and BMO, the Court entered an order extending, with the exception for the lease related to the Glen Ellyn location, the Deemed Rejection Date for the Unexpired Leases to June 22, 2012. The Deemed Rejection Date for the Glen Ellyn lease was extended to May 2, 2012.

104.    Thereafter, Movant further negotiated with the landlord for the Glen Ellyn Station and obtained the landlord's agreement to extend the Deemed Rejection Date for the Glen Ellyn Lease to December 31, 2012. Movant prepared the written consent form and provided same to counsel for the landlord. Movant also prepared and filed two motions to be heard on the same day - one seeking to approve the compromise between the Debtors and the landlord for the Glen Ellyn location and the other seeking the entry of an order extending the Deemed Rejection Date consistent therewith. Both motions were granted and the Deemed Rejection Date for the Glen Ellyn lease was extended to December 31, 2012 - which Movant believed at the time was going to be more than sufficient time to allow for a resolution of these cases.

105.    In June 2012, Movant contacted the Debtors' landlords for the RWJ Romeoville, RWJ Downers Grove and RWJ Munster locations and secured their agreements to extend the Deemed Rejection Date relating to their leases to December 31, 2012. Movant prepared the consent forms and motion necessary to obtain this extension and on June 21, 2012, the Court entered an Order extending the Deemed Rejection Date for the remaining Unexpired Leases to December 31, 2012. By obtaining these extensions, Movant was able to stave off the need to cure the defaults existing under these leases which would have required the payment of significant past due real estate taxes.

40

106.    In addition, since the necessary adversary proceeding for declaratory relief
regarding the scope and extent of the BP Use Restrictions could not be filed until the May Ruling
was clarified, without which the sale process could not generate a purchase offer in an amount that
BMO would accept, Movant performed the necessary research and analysis regarding the Debtors'
right to seek the assumption of the Debtors' four (4) Third Party Unexpired Leases without
prejudicing the Debtors' rights with respect to the BP Use Restrictions contained in the BP
assignment agreements. After all, the Debtors held fully assigned leases for which they paid
literally paid millions of dollars to acquire. Movant believed afer researching the mater that the
BP assignment documents, which were drafted by BP, either granted property "interests"in the
leases to BP or they didn't. The enforceability of such interests seemed best resolved through the
adversary proceeding suggested by the Court in connection with the Initial Sale Motion.

107.    Accordingly, after consultation with BMO and the Committee, it was determined
that the approach for seeking assumption of the Third Party Unexpired Leases without also
seeking the assumption of the BP assignment agreements best protected the Debtors' estates and
created a framework for possible settlement or further litigation regarding BP's asserted
"interests," although no outcome could ever be guaranteed.

108.    After the decision was made to proceed with the Lease Assumption Motion,
Movant contacted each of the Debtors' four landlords and sought their agreement to the
assumption of their respective lease. Movant was successful in obtaining the express written
agreement or consent from each of the four (4) landlords.

109.    With the agreement of each of the Debtors' landlords, Movant filed the Lease
Assumption Motion on October 29, 2012. On November 12, 2012, BP filed an objection to the

41

Lease Assumption Motion based in part again on the enforceability of the BP Use Restrictions. Movant carefully reviewed BP's objection and on November 20, 2012, after performing the necessary research, filed a lengthy reply in support of the Lease Assumption Motion.

110. On December 5, 2012, the Court issued an oral ruling denying the relief requested in the Lease Assumption Motion for the reasons stated on the record at the hearing. Thereafter, the Debtor and BMO filed a motion to alter or amend the Court's ruling. BP filed an objection to the motions. Movant necessarily prepared and filed a detailed reply brief in support of the motion to alter or amend. Not unexpectedly, the Court denied the Debtors' and BMO's motion to alter or amend the ruling on the Lease Assumption Motion.

111. With the denial of the Lease Assumption Motion, the hoped for sale of the Debtors' assets at a price sufficient to satisfy BMO's requirements for consent, at least at the time, was no longer realistic. The Debtors and Movant focused on the resumption of Chapter 11 plan discussions with creditor constituencies. The efforts put forth by Movant with respect to the Lease Assumption Motion were intended to preserve the rights of the Debtors' bankruptcy estates at a time when the BP Use Restrictions remained subject to dispute. Although ultimately the May Ruling would not be reversed, such that an adversary proceeding challenging the BP Use Restrictions could not be filed in these Chapter 11 Cases, the Lease Assumption Motion was prosecuted at a time when such results were far from certain. The efforts benefitted the Debtors' bankruptcy estates and allowed fore the Debtors to maintain their rights while the Debtors evaluating other alternative avenues for case resolution.

112. After the rulings on the Lease Assumption Motion and the upcoming Deemed Rejection Date, Movant again contacted the landlords for the Third Party Unexpired Leases in an

42

effort to obtain their consents to further extend the Deemed Rejection Date. Movant was able to negotiate additional six (6) month extensions with three (3) of the landlords in exchange for providing these landlords certain prepayment security deposits. Movant discussed the proposed arrangement with BMO, obtained the necessary consents, and prepared and filed a motion seeking to extend the Deemed Rejection Date and authorize the payment of the negotiated security deposits. On December 27, 2012, the Court entered an order granting the requested relief.

113.    As a result of the Glen Ellyn landlord's unwillingness to agree to any further extension of the Deemed Rejection Date, and rather than allowing this lease to be deemed rejected as a matter of law, Movant prepared and, on December 21, 2012, filed a motion on behalf of one of the Debtors - RWJ Glen Ellyn, LLC - seeking to assume the Glen Ellyn lease. On December 24, 2012, BP filed an objection to the requested relief. Movant was able to obtain the agreement of the landlord with respect to the assumption of the Glen Ellyn lease, but BP persisted in its objection. Movant attempted to reach a resolution with BP which would otherwise resolve the motion to assume the Glen Ellyn lease as well as the appeal issues (discussed further herein) related to the Lease Assumption Motion. Movant drafted and revised several proposed orders and circulated and discussed same with BP, BMO and the Committee. BP was unwilling to resolve these matters absent a better understanding of the global resolution of the Chapter 11 Cases. Consequently, the motion to assume the Glen Ellyn lease was continued by the Court from time to time through the end of the DIP Period.

### (ii)    Fuel Supply Arrangements

114.    Movant spent considerable time reviewing the fuel supply process and related executory contracts. After determining that one of the keys to a successful reorganization would be

43

to obtain improved fuel supply terms, Movant began negotiations with the Debtors' fuel suppliers.

This was an on-going process. As part of this process, Movant reviewed the claims of the fuel

suppliers and had numerous discussions with the Debtors and the fuel suppliers attempting to

reconcile the claim amounts which would be necessary if the Debtors were to proceed with an

agreement for improved fuel supply terms. Movant negotiated and drafted terms for revised fuel

supply agreements and had numerous telephone conferences and several lengthy meetings in

connection with obtaining the best fuel supply terms possible. Relatedly, so as to be ready to

promptly move forward with an improved fuel supply agreement, Movant researched issues

related to the rejection of certain executory contracts and prepared a motion authorizing the

Debtors to reject same.

115.    From the outset of the Chapter 11 Cases, the Debtors attempted to formulate a plan

of reorganization designed to successfully restructure the Debtors' liabilities and continue

operations, with the consent of BMO. To support such a plan, the Debtors commenced

negotiations with their Fuel Jobbers for improved fuel supply terms. The Debtors initially

received bids from two (2) of the Fuel Jobbers. Each of the bids contained long terms - up to

thirteen (13) years. The Debtors negotiated for an improvement in pricing and rebate terms with

both Fuel Jobbers, recognizing that the time period for fuel supply contracts is necessarily lengthy

in the industry.

116.    In late April, 2012, the Debtors obtained a favorable agreement with one of its Fuel

Jobbers to supply all ten (10) of their Stations (the "New Supply Arrangement"). The New Supply

Arrangement provided for a term of thirteen (13) years, but provided substantially better pricing

terms from which the Debtors intended to grow the volume and therefore profitability of their

motor fuel stations. At about the time that the New Supply Arrangement was worked out, BMO

required the commencement of a twin track approach for resolving these cases - a sale process and

continued plan negotiations - as a condition to the continued consensual use of cash collateral. A

long term fuel supply arrangement was inconsistent with a sale of the assets to a third party bidder.

Accordingly, the New Supply Arrangement was put on hold while the sale process was conducted.

Thereafter, the sale process necessarily became the focus of the Debtors.

117.    In January of 2013, the Debtors resumed discussions with their Fuel Jobbers.

Through a series of meetings, Movant and the Debtors obtained a new, improved fuel supply

arrangement with their Fuel Jobber. Shortly thereafter, however, BMO decided to conduct its own

fuel supply negotiations, focusing on the Debtors' other two Fuel Jobbers. BMO ultimately came

to terms with Graham at about or shortly after the Trustee was appointed.

118.    The efforts put forth by Movant ion negotiating, drafting and bring the parties to

terms of two (2) fuel supply agreements, albeit subject to court approval, were reasonable and

necessary and benefitted the Debtors' bankruptcy estates.

**(iii)    Other Executory Contract Matters**

119.    Movant culled through the Debtors many contracts in an effort to determine the

existence and nature of executory contracts and to analyze the extent of any cure costs and

rejection damages which may exist in the event the Debtors sought to assume or reject such

executory contracts. Movant analyzed the impact of the termination notices received from BP

with respect to the *am/pm* franchise agreements. Movant also reviewed with the Debtors

objections received to the proposed cure amounts filed by BP and the Fuel Jobbers.

## D. PLAN OF REORGANIZATION

### Services Rendered During the DIP Period

| Attorney | Hours | Rate | Value |
|---|---|---|---|
| MAC | 249.10 | $400/$430 | $ 107,017.00 |
| SBC | 98.80 | $295/$300 | $ 29,640.00 |
| CHG | 0.50 | $460 | $ 230.00 |
| RDR | 0.90 | $300 | $ 270.00 |
| NQR | 0.70 | $370/$400 | $ 259.00 |
| HLA | 7.70 | $460 | $ 3,542.00 |
| AFB | 4.60 | $300 | $ 1,380.00 |
| TOTAL | 362.3 | | $ 142,338.00 |

120.    Movant expended 362.3 hours during the DIP Period on Chapter 11 plan and
related matters (see **Schedule D** attached hereto).  With respect to this category of services,
Movant seeks allowance of the total amount set forth above and payment in the amount of: (a)
$11,729.00 remaining unpaid for services rendered during the period of August 26, 2011, and
January 31, 2013; plus (b)  $25,048.00, for services rendered to the extent of 65.9 hours during the
final two months of the DIP Period from February 1, 2013, through March 27, 2013. *See*, Schedule
D.  The hourly rates set forth above and in the attached Schedule D are consistent with Movant's
hourly rates set forth in the A&G Engagement Letter.

121.    The Debtors and Movant recognized early on that any successful resolution of the
Chapter 11 Cases would necessarily require the consent and agreement of both BMO and BP.
BMO held approximately ninety (90%) of the allowed pre-petition claims in the Chapter 11 Cases,
including the largest secured and unsecured claims.  BP held recorded use restrictions and other

46

significant rights with respect to the Debtors' motor fuel stations. The rights and claims of both of these creditors had to be addressed by the Debtors and Movant in the Chapter 11 Cases.

122.   Similarly, the pendency and importance of the BP Litigation impacted all aspects of the Debtors' decision making and conduct in the Chapter 11 Cases, including the Debtors' strategies with respect to the plan.

123.   Within the first two weeks after the Petition Date, Movant began working with the Debtors and BMO regarding the terms of a Chapter 11 plan. Movant continued outlining the terms for a proposed plan while contentious negotiations with BMO for the terms of an agreed order authorizing the use of cash collateral were ongoing. Movant's plan proposals favored by the Debtors were repeatedly rejected by BMO, however.

124.   Further, among other things, BMO was insistent that any final cash collateral order fully waive the Debtors' rights to file a Chapter 11 plan which provided for less than full payment in cash of BMO's prepetition debt. Movant had to carefully analyze the risks, consequences and benefits to the Debtors and their estates as well as the benefits to the continued prosecution of the BP Litigation through the resolution of lingering, continual cash collateral disputes in these Chapter 11 Cases.

125.   After weighing the options available to the Debtors, the Debtors agreed upon approach was put forth by Movant, resulting in the agreement of BMO to a cash collateral order containing provisions which preserved the Debtors' rights to file any Chapter 11 plan if the Debtors were able to pay down BMO's prepetition debt by $7,500,000 on or before January 31, 2012, more than one year after the Petition Date. At that time, the Debtors were preparing to go to trial in the BP Litigation and remained hopeful that a resolution of the BP could be reached,

thereby enabling the Debtors to not only resolve their issues with BP, but simultaneously put forth

a plan of reorganization to exit these Chapter 11 Cases which paid BMO down to the agreed upon

level.

126.    During the period of October, 2011, through April, 2012, Movant formulated and

presented to BMO alternative strategies for a Chapter 11 plan based upon improved operations,

rejection of unfavorable fuel supply relationships and completion of the BP Litigation.

127.    To further assist with plan options and otherwise exiting these Chapter 11 Cases,

beginning in November 2011, Movant and the Debtors opened discussions with an investment

banker and potential consultants regarding possible refinancing and capital raise efforts. Movant

had numerous discussions and meetings with Concord Financial Advisors, LLC, and Conway

MacKenzie regarding Chapter 11 plan, capital raise and case exit options.

128.    Movant also necessarily analyzed the claims filed by creditors and the Debtors'

books and records and prepared claims classification schedules and reports for use in plan

negotiations and ultimately the preparation of a disclosure statement. Movant also performed the

necessary research and analysis with respect to the rights of the Debtors' fuel jobbers with respect

to franchise agreements to be addressed in the Debtors' proposed plan.

129.    In early January 2012, Movant participated in a lengthy face to face meeting with

the Debtors, counsel for BMO, and the financial advisors of both BMO and the Debtors to discuss

alternative Chapter 11 plan options. Movant continued preparing settlement terms with respect to

a plan and, on January 13, 2012, sent a proposed term sheet outlining the parameters for a plan of

reorganization to counsel for BMO and the Committee. At the same time and in order to assist the

plan process, Movant continued to work with the Debtors and special counsel for the BP Litigation

48

on terms for a settlement with BP. After considerable effort and painstaking research and analysis, on January 27, 2012, Movant sent a lengthy and detailed memorandum regarding terms of the Debtors' proposed plan of reorganization with supporting projections to BMO. Unfortunately, the Debtors proposal submitted by Movant was rejected buy BMO at that time.

130.    Remaining undaunted by BMO's response, Movant thereafter and throughout the months of February though April, 2012, conducted numerous conference calls and meetings with the Debtors and BMO regarding the contours of a consensual plan of reorganization and alternative proposals.

131.    During the negotiations and as the ruling in the BP Litigation became closer, however, BMO pressed more and more for a complete waiver of the Debtors' plan rights as they related to BMO. In light of the importance of the BP Litigation - the matter being "under advisement" at the time - and the amount of BMO's indebtedness, the Debtors agreed to an amendment of the Final Cash Collateral Order to provide that if the Debtors were to file a Chapter 11 Plan without the support of BMO, a default shall have occurred under the Final Cash Collateral Order, resulting in the termination of further use of cash collateral. *C.f.*, Tenth Order Amending that Certain Final Order Authorizing Debtor to: (A) Use Cash Collateral; and (B) Grant Certain Liens and Provide Security and Other Relief to BMO Harris Bank N.A., dated April 18, 2012 [**docket no. 376**] and subsequent orders. Accordingly, the Debtors were able to continue to prosecute the BP Litigation without the risk of losing the right to use their cash collateral.

132.    On April 24, 2012, BMO submitted a term sheet for a proposed plan of reorganization for the Debtors' consideration. Movant spent necessary time analyzing BMO's proposal and advising the Debtors of their rights and obligations with respect to same.

49

133.    While the Debtors were considering BMO's proposal, on May 2, 2012, the May
Ruling was rendered in the BP Litigation.  Movant promptly began evaluating the impact of the
ruling and how such would impact any plan of reorganization. At about the same time, BMO
required the commencement of a twin track approach for resolving the Chapter 11 Cases -
continued plan negotiations and a sale process - as a condition to the continued use of cash
collateral.

134.    Shortly thereafter, the plan negotiations were held in abeyance while the Debtors'
focus was directed towards implementing a sale process aimed at maximizing proceeds for the
benefit of the Debtors' creditors and estates. By January of 2013, the sale efforts had not produced
an acceptable buyer - primarily as a result of an impasse between the competing interests of BMO
and BP - which is addressed in Section IV(G) infra.  At that time, Movant and the Debtors
resumed the efforts at arriving at a consensus on a Chapter 11 plan as a means of exiting these
Chapter 11 Cases.

135.    As stated, the Debtors were essentially precluded from filing a Chapter 11 plan
without the support of BMO pursuant to the amended Final Cash Collateral Order. By this point,
BMO was insisting on a Chapter 11 plan premised upon BMO owning the reorganized debtor.
Accordingly, Movant performed the necessary research and analysis with respect to a lender
owned gas station business while avoiding any duplication of the plan preparation efforts already
conducted.  Ultimately, the Debtors advised the Court and agreed to the entry of an order fixing
March 19, 2013, as a date for the filing of a consensual plan in these Chapter 11 Cases.

136.    It soon became obvious to the Debtors and Movant that a "BMO owned"
reorganized debtor raised challenges and impasses which could not be overcome. Movant did not

50

believe that a large financial institution would want to get into the gas station business as BMO
had proposed. Movant's research and plan preparations confirmed Movant's belief. A BMO
owned reorganized debtor plan could not work for a group of BP branded stations under the
circumstances present in the Chapter 11 Cases.

137.    The Debtors also received a Chapter 11 plan proposed by the Committee and BMO
based in part upon a division of the Debtors' assets between a BMO controlled entity and a
creditor trust. The plan appeared to the Debtors and Movant to be more of a placeholder document
than something that could realistically be confirmed. Further delay and lingering in Chapter 11
was not acceptable to the Debtors. The Debtors accordingly filed the Conversion Motion in these
Chapter 11 Cases to cause the necessary change.

138.    In short, Movant has worked with the Debtors and BMO over the nineteen (19)
months of these Chapter 11 Cases analyzing, researching, preparing and negotiating a Chapter 11
plan for the benefit of the Debtors' bankruptcy estates. Although a plan could not be filed under
the circumstances faced by Movant in light of the default provisions of the Final Cash Collateral
Order, Movants significant services with respect to plan matters were reasonable and necessary in
these Chapter 11 Cases and benefitted the Debtors' bankruptcy estates.

### E.  BP MATTERS

#### Services Rendered During the DIP Period

| Attorney | Hours | Rate | Value | |
|----------|-------|------|-------|---|
| MAC | 214.10 | $400/$430 | $ | 91,397.00 |
| SBC | 34.70 | $295/$300 | $ | 10,343.50 |
| CHG | 1.30 | $460 | $ | 598.00 |
| RDR | 1.00 | $265/$300 | $ | 265.00 |

51

| Attorney | Hours | Rate | Value |
|----------|-------|------|-------|
| NQR | 0.60 | $370/$400 | $       222.00 |
| HLA | 4.40 | $460 | $     2,024.00 |
| AFB | 74.80 | $300 | $    22,440.00 |
| TOTAL | 330.9 | | $   127,289.50 |

139.    Movant expended 330.9 hours during the DIP Period on BP related matters (see

**Schedule E** attached hereto). With respect to this category of services, Movant seeks allowance of

the total amount set forth above and payment in the amount of (a) $12,531.86 remaining unpaid for

services rendered during the period of August 26, 2011, and January 31, 2013; plus (b) $3,874.00,

for services rendered to the extent of 10.4 hours during the final two months of the DIP Period,

from February 1, 2013, through March 27, 2013. *See*, Schedule E. The hourly rates set forth above

and in the attached Schedule E are consistent with Movant's hourly rates set forth in the A&G

Engagement Letter.

140.    As stated, the BP Litigation was considered by the Debtors as a significant asset of

the Debtors' bankruptcy estates. Further, no Chapter 11 plan could be confirmed in these Chapter

11 Cases without the resolution of the BP Litigation  Accordingly, Movant necessarily addressed

the issues and matters which arose in connection with BP as a result of the Debtors being Chapter

11 debtors in bankruptcy, while avoiding the duplication of services rendered by the BP Litigation

Counsel.

141.    In that regard, Movant initially researched and analyzed the scope and impact of the

automatic stay with respect to the various actions and events that the Debtors would face in the BP

Litigation promptly upon the filing of the Chapter 11 Cases. Thereafter, Movant performed the

necessary services to seek and obtain the employment of BP Litigation Counsel in the Chapter 11

Cases. After the retention of BP Litigation Counsel, Movant advised on bankruptcy issues as they

arose during the BP Litigation. At all times, Movant endeavored to avoid duplicating the efforts of

BP Litigation Counsel.

142.    Indeed, from the period of November 2011, after BP Litigation Counsel were

retained through the entry of the May Ruling, precious little time was spent by Movant with

respect to BP Litigation Matters. During that time, most matters, including settlement discussions,

were handled by the BP Litigation Counsel to avoid the duplication of services and allow for the

Debtors' rights to be liquidated through one source. Although Movant was made aware of

developments and advised on bankruptcy issues, the BP Litigation was conducted by the BP

Litigation Counsel. Movant also worked to keep counsel for BMO and the Committee informed

about the status and developments in the BP Litigation.

143.    As is evident from the detail attached hereto as Schedule E, Movant's involvement

in BP matters necessarily increased after the May Ruling was entered in the BP Litigation through

the end of the DIP Period.   As stated, the ruling in favor of BP changed the direction of the

Chapter 11 Cases and the options available to the Debtors with respect to a successful resolution of

these Chapter 11 Cases.

144.    More specifically, the sale options available to the Debtors after the May Ruling

became more attractive to BMO and were pressed forward by the Debtors and Movant. Movant

did not expect BP to be a "willing partner" in a sale process after being successful in the BP

Litigation. Said litigation was a long, hard fought "slug it out" battle between very well counseled

adversaries. Nevertheless, Movant and the Debtors attempted to avoid disputes with BP in the sale

process where possible.

53

145.    When BP objected to the Debtors' initial sale process, the Debtors and Movants
were required to proceed through an adversary proceeding to establish the extent and scope of the
language of the BP Use Restrictions. As is reflected in the attached detail, Movant researched,
evaluated and prepared the necessary declaratory judgment action to be filed to once and for all
clarify and establish the extent of the BP Use Restrictions.

146.    Unfortunately, Movant could not file the necessary adversary proceeding until the
portions of the May Ruling regarding the validity of the BP Use Restrictions had been clarified.
Although it was clear to the Debtors that the issues raised by BP at the Debtors' sale hearing were
not decided by the State Court in the May Ruling, the broad language of the opinion arguably left
open an assertion that the May Ruling precluded the commencement of the Debtors' declaratory
judgment action in the Chapter 11 Cases, whether through the application of res judicata, collateral
estoppel or similar principles. Accordingly, Movant spent the necessary time assisting BP
Litigation Counsel in identifying arguments to be made relevant to any res judicata concerns in
connection with the motion to reconsider that the Debtors' intended to file in that litigation.

147.    During this period, however, the Debtors and Movant also engaged in settlement
discussions with BP. Three (3) separate settlement proposals and variations of proposals were
prepared by Movant on behalf of the Debtors and presented to BP. Movant believed that a
settlement of the issues involving BP was in the best interests of creditors and acted to achieve a
settlement. A settlement was not reached, however, in part because BP was not willing to settle,
having already won the BP Litigation at the Trial Court level.

148.    In addition to the litigation and settlement efforts performed by Movant, certain
efforts were performed in connection with the Debtors' day to day operations involving BP.

54

Movants assisted the Debtors in evaluating the Debtors' rights with respect to the termination of the am/pm Franchises by BP. The franchises were terminated according to the procedures set forth in the Debtors' franchise agreements. Ironically, BP accomplished through the termination of the am/pm franchises what the Debtors had attempted to do in the BP Litigation: be free from the limitations imposed bye the am/pm Franchise. Movants also evaluated the Debtors' BP contract obligations as they arose in the course of the DIP Period. Movants assisted in the efforts to replace BP's retalix system and the migration to a new system. Movant also evaluated BP expense and claim issues as they arose during the Chapter 11 Cases.

149. At all times, Movant attempted to perform those services necessary to preserve and enhance the Debtors' estates while avoiding the duplication of services being performed by the Debtors' other professionals.

## F. FUEL SUPPLY LITIGATION

### Services Rendered During the DIP Period

| Attorney | Hours | Rate | Value |
|---|---|---|---|
| MAC | 51.40 | $400/$430 | $ 21,778.00 |
| JB | 3.50 | $125/$135 | $ 437.50 |
| SBC | 236.70 | $295/$300 | $ 70,873.00 |
| RDR | 2.70 | $300 | $ 810.00 |
| NQR | 121.10 | $370/$400 | $ 46,562.00 |
| HLA | 1.00 | $460 | $ 460.00 |
| ESB | 0.50 | $300 | $ 150.00 |
| TOTAL | 416.9 | | $ 141,070.50 |

150.    Movant expended 416.9 hours during the DIP Period in this category (see **Schedule F** attached hereto). With respect to this category of services, Movant seeks allowance of the total amount set forth above and payment in the amount of $14,107.05 remaining unpaid for services rendered during the period of August 26, 2011, and January 31, 2013. The hourly rates set forth above and in the attached Schedule F are consistent with Movant's hourly rates set forth in the A&G Engagement Letter.

151.    During the first week of these Chapter 11 Cases, Movant immediately began addressing issues concerning the enforceability of the rights of the Debtors with respect to the Fuel Jobbers, the claims of the Fuel Jobbers and ongoing supply of fuel to the Debtors' ten (10) motor fuel locations. Movant communicated early on with counsel for BMO and for each of the Fuel Jobbers and promptly began reviewing information from the Debtors with respect to analyzing and reconciling the receipt and application of credit card proceeds generated from sales at the Debtors' locations both prepetition and postpetition.

152.    Generally, the Debtors' credit card transactions are and were processed by BP who remitted the proceeds to the Fuel Jobbers who in turn applied the proceeds to the amounts owed by the Debtors for fuel delivered to the Debtors' locations. As of the Petition Date, the amount of unapplied credit card proceeds which the Fuel Jobbers were holding from credit card transactions generated prepetition was unclear. The Fuel Jobbers were of course interested in minimizing any risk of not being paid for any fuel deliveries provided prepetition. The Debtors needed to ensure the Fuel Jobbers were not improperly being paid for prepetition deliveries after the commencement of the Chapter 11 Cases. Numerous conference calls ensued involving counsel for Movant, the Fuel Jobbers and BMO. While the parties were in the process of reconciling these amounts, on

56

September 14, 2011, the Debtors' largest fuel supplier - which supplied fuel to 7 of the Debtors'

10 Stations - abruptly and unilaterally demanded that the Debtors provide payment in advance for

any future fuel deliveries. Movant assisted the Debtors in providing the necessary prepayments

required by this Fuel Jobber. Notwithstanding, some of the Debtors' locations did not receive

deliveries as required and/or were left with insufficient fuel levels such that the Debtors were

unable to sell fuel to their customers. The logistical nightmares which ensued from the

prepayment requirement became readily apparent to the Debtors and Movant diligently worked to

and obtained agreements with each of the Fuel Jobbers to return to or remain on, as the case may

be, the prepetition invoicing terms and payment process.

153.   In order to, among other things, ensure the Debtors' estates would not be further

harmed by conduct of the Fuel Jobbers and that creditors were not being improperly paid on

prepetition claims, Movant prepared and filed a complaint against BP and the Fuel Jobbers

commencing the Fuel Supply Adversary and seeking declaratory and injunctive relief, accounting

and turnover, damages for violations of the automatic stay and equitable subordination.

154.   Since the filing of the Fuel Supply Adversary throughout the duration of the DIP

Period, the Debtors received uninterrupted fuel deliveries from the Fuel Jobbers in accordance

with the prepetition invoicing terms. In order to get up to speed on the complicated matters

relating to fuel supply and avoid raising issues previously asserted and/or pending in the BP

Litigation, Movant spent significant time reviewing the Debtors' franchise agreements, dealer

supply agreements, assignments of the dealer supply agreements, and pleadings as well as

discussing issues with the Debtors and their special counsel in the BP Litigation. The Debtors

could ill afford to be in a position without fuel. Unclear as to how the Fuel Jobbers might react to

57

the Adversary Proceeding, Movant struggled with whether other injunctive relief might be
appropriate and had discussed and prepared for the possibility of proceeding with a request for a
temporary restraining order. Upon filing the complaint, Movant reached out to counsel for the
Fuel Jobbers to explain and discuss the nature of the relief being sought.

155.    The complaint drew several motions to dismiss to which Movant, with input from
BP Litigation Counsel, responded. While simultaneously working on the response, Movant
proceeded with efforts to reach a settlement with BP which would obviate the need for any further
involvement of BP in the Fuel Supply Adversary. Movant believed that a resolution of matters
through compromise, if possible, would be better than litigation and continued adversarial
hearings. In furtherance of this belief, Movant crafted and submitted a detailed proposed
settlement order to BP with respect to BP's motion to dismiss and other bankruptcy issues - such
settlement proposal was rejected. As a result, Movant returned its attention to responding to the
multiple motions to dismiss and BP's request for abstention. After an initial ruling on these
motions by this Court granting abstention, among other relief, and following a ruling rendered in
the BP Litigation, BP filed a renewed motion seeking to dismiss BP from the Adversary
Proceeding. Movant prepared a response to this renewed motion and BP's renewed motion was
denied.

156.    Movant also spent time addressing affirmative defenses raised by the defendants in
the Fuel Supply Adversary and proceeding with efforts to commence needed discovery.
Ultimately, in light of the Court's ruling on abstention and in an effort to minimize expenses
pending a final order in the BP Litigation and while Movant and the Debtors continued to reach a

58

consensual resolution of these Chapter 11 Cases, the Fuel Supply Adversary was essentially put on

hold and all matters arising in the Adversary Proceeding were continued from time to time.

## G.  ASSET SALE EFFORTS

### Services Rendered During the DIP Period

| Attorney | Hours | Rate | Value |
|----------|-------|------|-------|
| MAC | 329.80 | $430 | $ 141,814.00 |
| SBC | 255.40 | $300 | $ 76,620.00 |
| CHG | 104.90 | $460 | $ 48,254.00 |
| HLA | 5.80 | $460 | $ 2,668.00 |
| HBM | 39.70 | $460 | $ 18,262.00 |
| AFB | 4.40 | $300 | $ 1,320.00 |
| TOTAL | 740 | | $ 288,938.00 |

157.    Movant expended 740 hours during the DIP Period in this category (see **Schedule
G** attached hereto).  With respect to this category of services, Movant seeks allowance of the total

amount set forth above and payment in the amount of (a) $50,693.80 for services rendered during

the period of August 26, 2011, and January 31, 2013; plus (b) $21,690.00, for services rendered to

the extent of 57 hours during the final two months of the DIP Period from February 1, 2013,

through March 27, 2013. *See*, Schedule G. The hourly rates set forth above and in the attached

Schedule G are consistent with Movant's hourly rates set forth in the A&G Engagement Letter.

158.    As stated, the Debtors' direction in these Chapter 11 Cases were to prosecute the

BP Litigation and, through those efforts, obtain substantial improvement in business terms, remove

value-hampering processes and ultimately increase the overall value of the Debtors' estates.

159.    The May Ruling changed the landscape in these Chapter 11 Cases. While the

Debtors continued to believe in the merits of the claims alleged in the BP Litigation and even

59

proposed the appeal of the May Ruling, the timing on any appeal process combined with the status and length of pendency of the Chapter 11 Cases created hurdles that BMO could not clear.

160.    Accordingly, after a thorough review of the May Ruling was accomplished, and in light of BMO's position on an RWJ reorganization, Movant and the Debtors proceeded with an aggressive marketing process for the Debtors' property all while the prosecution of the Debtors' appeal rights continued.

161.    With the recommendations of BMO and the Committee, and after having interviewed several investment banking firms, the Debtors selected and sought the retention of Matrix as the Debtors' investment banker to assist in the marketing of the Debtors' assets for sale. Movant prepared and filed the Debtors' Application for an Order Authorizing Employment and Retention of Matrix As Debtors' Investment Bankers [**docket no. 438**], which was granted on July 18, 2012.

162.    With the assistance and advice of Matrix, Movant and the Debtors embarked on a systematic and thorough marketing process for the Debtors' property, intended to ensure that the highest and best offer that could possibly be obtained would be obtained for the benefit of the Debtors' bankruptcy estates. Relevant financial information, key contracts and other asset information was assembled with the assistance of Movant and deposited into a "data room" for prospective bidders. Over sixty (60) potential bidders were subsequently contacted to generate interest in, and ultimately an offer to purchase, the Debtors' assets. Approximately eighteen (18) of those potential bidders executed confidentiality agreements regarding the Debtors' information and were granted access to the Debtors' data room.

163.    In addition, on August 9, 2012, Movant filed the Initial Sale Motion which Movant
had prepared to cause the sale of substantially all of the Debtors assets in these Chapter 11 Cases.
The process set forth in the Initial Sale Motion contemplated the preservation of the Debtors'
claims asserted in the BP Litigation, to the extent possible, as well as the rights of the Debtors
under the Code.  The purpose of the motion in part was to facilitate interest among potential
bidders and to calm the fears of quite a few that believed a sale of the Debtors' assets would be
thwarted by various constituencies.

164.    On August 20, 2012, BP filed the BP Objection and essentially contended that the
Initial Sale Motion provided for an interpretation of the BP Use Restrictions unacceptable to BP.
Although Movant and the Debtors believed that the language of the BP Use Restrictions provided
what they provided and that it was premature to address the BP Objection until an asset purchase
agreement was worked out, the Court concluded that the interpretation of the BP Use Restrictions
required the filing of an adversary proceeding.  Accordingly, the Court denied the relief requested
in the Initial Sale Motion, without prejudice to re-filing the motion with procedures consistent with
the Court's observations regarding the process for adjudicating any issues with respect to the BP
Use Restrictions.

165.    Unfortunately, as stated, the breadth of the May Ruling in the BP Litigation
arguably (at least according to BP) included the conclusion that the BP Use Restrictions were valid
and enforceable.  The Debtors would first have to obtain a clarification of the May Ruling before
Movants could proceed with an adversary proceeding regarding the scope and extent of the BP
Use Restrictions in the Chapter 11 Cases.

61

166.    Accordingly, Movant prepared and, on August 31, 2012, assisted the Debtors in filing the Renewed Sale Motion, which preserved the enforceability of the BP Use Restrictions. The Approved Bidding Procedures Order was also prepared by Movant, with the assistance of counsel for BMO and the Committee and filed along with the Renewed Sale Motion.

167.    Thereafter, Movant spent considerable time assisting the Debtors and Matrix in marketing the Debtors' assets for sale. Through the marketing process, the Debtors received written asset purchase agreements and/or letters of intent from three (3) BP jobbers with purchase prices at or slightly above the purchase price of "$20 million plus inventory." The Debtors also received other offers below the $20 million plus inventory price range.

168.    Also during this period, the Debtors identified and conducted negotiations with five (5) other independent, "non-BP" fuel operators and suppliers. The Debtors believed that they needed to canvass the whole potential bid pool for the Debtors' assets and not just existing BP operators and jobbers. An expansion of the potential bidders beyond the Debtors' existing jobbers would help to generate interest and ultimately a significantly higher sale price for the Stations. The interests of the Debtors' bankruptcy estates required the exploration of alternatives available to the Debtors with respect to the sale of substantially all of the Debtors' assets. Accordingly, Movant spent the necessary time negotiating with non-BP jobbers and operators.

169.    Ultimately, the Debtors received a favorable letter of intent from Buck's for the purchase of substantially all of the Debtors' assets. The purchase price initially offered by Buck's was negotiated upward by Matrix to the amount of $23,750,000 plus the value of inventory on hand at closing and the assumption of certain liabilities. At the negotiated purchase, Movant recognized that a sale to Buck's could come very close to satisfying BMO's claims in full.

62

Accordingly, Movant worked diligently with Buck's' in house counsel and counsel for BMO to hammer out an acceptable asset purchase agreement with respect to the Buck's' proposal. After several weeks of exchanging draft agreements and negotiating key terms, Movant was able to complete the Buck's Offer, which was executed by Buck's and the Debtors.

170.    Thereafter, Movant prepared and filed the RWJ Stalking Horse Motion, which the Court granted pursuant to the Stalking Horse Order. The new auction date for the sale of the Debtors' assets was set for November 28, 2012, and a sale hearing was to be held on the results of the auction on December 5, 2012.

171.    A major condition to the closing of the Buck's Offer, however, was that Buck's obtain fuel supply for the Stations directly from BP, or via some other acceptable process to Buck's. The Debtors' Fuel Jobbers were not intended to be used by Buck's' post-closing.

172.    BP unfortunately took the position that any purchaser of the Debtors' Stations would have to obtain BP fuel for the sites through the Debtors' existing three (3) jobbers or a fourth jobber having previously been granted rights in BP's "Chicagoland" market. Since Buck's was not one of the four current jobbers permitted by BP to supply BP's Chicagoland market, Buck's was rejected by BP as an entity eligible to supply the Debtors' Stations.

173.    As a result of the inability to satisfy the fuel supply contingency contained in the Buck's Offer, the Debtors, BMO and the Committee agreed to the termination of the Buck's Offer and the return of the related deposit to Buck's. Movant drafted and worked out a settlement agreement with Buck's which achieved the goals of the parties and protected the Debtors' estates from unwanted future litigation with Buck's. On March 14, 2013, the Court entered a stipulation and agreed order [**docket no. 684**] prepared by Movant approving the Buck's settlement.

174.   Given the parameters created by the circumstances, the realistic number of potential bidders was reduced to essentially the Debtors' three existing jobbers and Sassafrasnet, LLC. Movant worked with the Debtors and Matrix to generate an offer from the existing jobber pool.

175.   Notwithstanding Movant's efforts, Movant recognized that the likely proceeds generated through a sale to a bidder who must use one of the four (4) jobbers authorized by BP to supply fuel in BP's Chicago-land market would be substantially below the amount necessary to fall in the range of purchase prices BMO would be willing to accept on its secured indebtedness.

176.   At the time of the filing of the Conversion Motion, Sassafrasnet, LLC, the fourth Chicagoland jobber recognized by BP, was really the only BP jobber pursuing the purchase of the Debtors' assets.

177.   In summary, notwithstanding the limitations imposed upon the Debtors and Movant by the circumstances, Movant worked diligently to generate an asset purchase contract which maximized the value of the Debtors' estates.  Over the approximate six (6) month period of the marketing process, Movant, Matrix and the Debtors engaged in an exhaustive marketing effort which did not have to be duplicated by the Trustee. The market for the Debtors' assets was tested at several levels.  Through no fault of Movant, the Buck's Offer and the other contracts and letters of intent did not culminate in the sale of the Debtors' assets. Yet, the market had been fully tested and the parties could proceed with the Graham Asset Sale knowing that the offer from Graham was the highest and best under the existing circumstances.

178.   Under these circumstances, Movant submits that all of the time spent by Movant with respect to the asset sale matters was beneficial to the Debtors bankruptcy estates and reasonably and necessarily incurred.

64

## H.  FEE PETITION

### Services Rendered During (and after) the DIP Period

| Attorney | Hours | Rate | Value | |
|---|---|---|---|---|
| MAC | 53.67 | $430 | $ | 21,116.40 |
| SBC | 49.11 | $300 | $ | 16,077.60 |
| TOTAL* | 102.78 | | $ | 37,194.00 |

(*Reduced to **2%** of the total payment sought)

179.   Movant expended approximately 171 hours during and after the DIP Period in connection with fee petition preparation matters (see **Schedule H** attached hereto).  Movant had not requested any interim payments with respect to this category prior to the filing of this Application. In accordance with the practices in this jurisdiction, Movant has discounted the amount sought herein to $37,194.00 or approximately two (2%) percent of the total fees requested.

180.   The services rendered by Movant in this category during the DIP Period comply with the guidelines established by the Court in the cases of In re Pettibone Corp., 74 B.R. 293 (Bankr. N.D. Ill. 1987), In re Wildman, 72 B.R. 700 (Bankr. N.D. Ill. 1987) and In re Spanjer Brothers, Inc., 203 B.R. 85 (Bankr. N.D. Ill. 1996).  In that regard, Movant is entitled to receive compensation for the preparation of this fee petition in accordance with In re NuCorp Energy, Inc., 764 F.2d 655 (9th Cir. 1985).

181.   As would be expected for a request spanning nineteen (19) months of services rendered to the twelve (12) Debtors, the actual time spent by Movant in preparing this Application far exceed the amounts sought above to be recovered by Movant in connection with this category.

65

## V. **ASSISTANCE OF THE CHAPTER 11 TRUSTEE**

182. Consistent with the Debtors' and Movant's representations at the hearing on the

approval of the appointment of the Trustee as Chapter 11 Trustee in these Chapter 11 Cases,

Movant assisted the Trustee when requested throughout the period of these Chapter 11 Cases after

the Trustee's appointment.

183. Movant expended in excess of 60 hours after the DIP Period (see **Schedule I**

attached hereto) assisting the Trustee on matters facing the Debtors' estates. Movant provided

detailed responses to the Trustee's inquiries and questions and supplied requested information to

the Trustee promptly upon request. Throughout the post-DIP Period, Movant was a source to the

Trustee for information and understanding of prior events for the benefit of the Debtors'

bankruptcy estates.

184. Although Movant does not seek payment or recovery herein for any of such

services, the efforts Movant put forth support Movant's request for compensation in this

Application.

## VI.

## **STANDARDS FOR REVIEW**

185. The Court need look no further than Local Rule 5082-1 and the opinions in In re

Pettibone Corp., 74 B.R. 293 (Bankr. N.D. Ill. 1987) and In re Wildman, 72 B.R. 700 (Bankr. N.D.

Ill. 1987) for the applicable standard of review of the Final Application. The court in Pettibone, at

74 B.R. 301 stated:

> Under Sections 330 and 331 of the Bankruptcy Code, professionals applying for
> fees must demonstrate in writing that their services were (1) actual; (2) necessary,
> and (3) reasonable. Once services have been performed, Bankruptcy Rule 2016
> requires that:

66

> A person seeking interim or final compensation for services, or
> reimbursement of necessary expenses, from the estate shall file with
> the court an application setting forth a <u>detailed</u> statement of (1) the
> services rendered, time expended and expenses incurred, and (2) the
> amounts requested. (Emphasis in original.)

These detailed applications establish the "actual", while an accompanying
narrative explanation of the "how" and "why" establishes the "necessary".

The primary objective of any fee petition is to reveal sufficient data to
enable the Court to determine whether the services rendered were
reasonable, actual and necessary. <u>In re Jensen-Farley Pictures, Inc.</u>, 47
B.R. 557 at 582 (Bankr. D.Utah, 1985).

186.    While the Court has wide discretion in reviewing a fee petition, such authority must

be dispensed with great care and fairness, <u>In re Wildman</u>, 72 B.R. at 705, while keeping in mind

that the well accepted goal is to encourage and induce capable attorneys to practice in the

Bankruptcy Court. <u>In re Pettibone</u>, 74 B.R. at 306.

187.    "The main objective of a fee application is to disclose sufficient information to

enable a court to assess whether the services provided were reasonable, actual, and necessary." <u>In</u>

<u>re Eckert</u>, 414 B.R. 404, 410 (Bankr. N.D. Ill. 2009) citing <u>Wildman</u>.   In analyzing a fee petition,

the Court must determine "what the lawyer would receive if he were selling his services in the

market rather than being paid by court order." <u>Matter of Continental Illinois Securities Litigation</u>,

962 F.2d 566, 568 (7th Cir. 1992).  Moreover, as stated in <u>In re Boston and Maine Corporation</u>,

776 F.2d 2, 10 (1st Cir. 1985), the Court should focus on the benefits to the estate and the quality

of the performance of counsel in the context of the case <u>as a whole</u>:

> Given these circumstances, it is important for a court to maintain "a sense
> of overall proportion," <u>Gabriel v. Southworth</u>, 712 F.2d 1505, 1507 (1st
> Cir. 1983), and not "become enmeshed in meticulous analysis of every
> detailed facet of the professional representation," <u>Lindy Brothers Builders</u>,

67

Inc. v. American Radiator & Standard Sanitary Corp., 540 F.2d 102, 116
(3d Cir. 1976) ("Lindy II"). It is easy to speculate in retrospect that the
work could have been done in less time or with fewer attorneys or with an
associate rather than a partner. On the other hand, it is also possible that
B&M would not have enjoyed the success it did had its counsel managed
matters differently. Fee-cutting "ideally should be tempered with a view
towards the need for the services at the time they were rendered." In re
Casco, 25 B.R. at 756 (Emphasis in original.)

188.    Satisfaction of the "actual" standard is achieved by properly documenting the

services rendered. Detailed fee applications allow the Court to properly view time entries.

However, where the time reported as a whole is not disproportionate to the complexity of the

case, compensation requested should not be disallowed because of lack of detail. In re Wire

Cloth Products, Inc., 130 B.R. 798 (Bankr.N.D.Ill. 1991).

189.    The "necessary" standard of Section 330 overruled the pre-Code concept of

conservation of the estate. As was stated in Lifschultz Fast Freight, 140 B.R. at 490:

The issue under Section 330(a) is whether services for which compensation is sought are
"necessary services." Necessary services have always included services that aid in the
administration of the case and help the client fulfill duties under bankruptcy law, whether
or not those services result in a monetary benefit to the estate.

Concomitant with the "necessary" standard is the need for Movant's billing judgment. Simply

put, a bankruptcy estate should not bear the burden of unnecessary duplication of services.

Pettibone Corp., 74 B.R. at 303.

190.    The "reasonableness" standard of Section 330 includes many factors for

consideration. The court in Pennsylvania v. Delaware Valley Citizens Council, 478 U.S. 546,

106 Sup. Ct. 3088, 92 L.Ed 2d 439 (1986) confirmed its decision in Blum v. Stevenson, 465 U.S.

886, 104 S. Ct. 1541; 79 L.Ed 2d 891 (1984) addressed the weight to be accorded to a "lodestar"

figure:

68

We emphasized, however, that the figure resulting from this calculation is more than a mere "rough guess" or initial approximation of the final award to be made. Instead we found that "[w]hen ... the applicant for a fee has carried his burden of showing that the claimed rate and number of hours are reasonable, the resulting product is presumed to be the reasonable fee..." to which counsel is entitled. Id. at 897, 104 S. Ct. at 1548 (emphasis added).

106 Sup. Ct. at 3098.

191.     Other factors which bear on the reasonableness of a fee request include: (1) The difficulty and novelty of the case; (2) the preclusion of employment by the attorney due to acceptance of the case; and (3) the benefit achieved. In re Wire Cloth Products, Inc., 130 B.R. 798, 807.

192.     Movant has endeavored to prepare this Application in accordance with the standards and guidelines outlined in Pettibone and Wildman.

Form of Application

A.     Itemized Daily Entries - Categories A through I contain detailed entries listing the subject activity; the date; the time spent; the nature of the services rendered; and the purpose for same. Explanations are included to inform the reader of the circumstances giving rise to the activity.

B.     Telephone Conferences - Telephone conferences are detailed with disclosure of the topic of discussion, as well as the person called and reason therefor.  Telephone conferences are cost beneficial to the estate as they provide the most efficient way to handle the numerous matters involved.

C.     Meetings and Office Conferences - Movant spent considerable time in meetings and conferences as a means of performing the services required. Where a meeting is described, the persons present and topics discussed are set forth.

69

D.    Drafting - The drafting of documents, letters, motions and orders is clearly delineated. The complexity of the matters and the numerous parties involved often dictated many revisions.

E.    Legal Research - While the members of Movant have devoted substantially all their professional careers to the practice of commercial law, bankruptcy, insolvency and corporate reorganizations, legal research was essential on numerous occasions in a case of this magnitude. A lawyer who does not spend considerable time in the law library is doing a disservice to his client, and will soon find out that the rapidly evolving field of bankruptcy law is leaving him or her behind. Indeed, the Seventh Circuit has recognized the need and requirement for constant research and preparation by attorneys, even in their own specialized areas of concentration. See Continental Securities, 962 F.2d at 570 (when addressing the fee request of securities lawyers in a class action securities lawsuit, the Court stated that "no one carries the whole of federal securities law -- not only the many detailed statutes and regulations but the thousands of decided cases -- around in his head, and a lawyer who tries to respond to a motion or brief without conducting fresh research is courting sanctions or a malpractice suit.")

F.    Minimum Time - Movant does not apply a uniform amount of time to a particular activity. The time entries herein have been kept on a tenth of an hour basis. The Court should be sensitive, however, to the reality that bankruptcy cases do not lend themselves to meticulous time keeping. Oftentimes, a lawyer's need to concentrate, the press of time and the emotion and energy involved, interfere with time keeping with exacting detail. Great care has been utilized to keep reasonably accurate time. Movant asks this Court to bear in mind the "big picture" context hereinbefore described by the First Circuit Court of Appeals in the Boston and Maine case.

70

G.      Lumping - Movant has endeavored to avoid grouping a number of unrelated

activities into the same time entry. The Court should, however, keep in mind that in a case of the

complexity of this case, meetings or telephone conferences will involve the discussion of

numerous topics and several telephone calls may be made to a number of parties in rapid

succession on one or more topic areas. The entries elaborately describe each activity with

identification of the party, the purpose of the activity and in many cases, the necessity thereof.

Such grouping is unavoidable, but the informative explanations herein serve to further describe

and delineate the time spent.

193.    In addition, the negotiated carveouts, including but not limited to the Professional

Carveout, that Movant and Committee counsel had obtained by agreement from BMO shall serve

to protect the Debtors' bankruptcy estates.  Fees and expenses earned and incurred by Movant,

the Debtors' other professionals, professionals for the Committee and, most importantly, the

expenses of third party vendors and suppliers were carved out of BMO's liens and security

interests pursuant to the Final Cash Collateral Order and DIP Financing Orders.  As a result, the

Debtors' estates were not administratively insolvent through the end of the DIP period and are

believed to remain so now.

194.    To be sure, the Seventh Circuit Court of Appeals has recognized that parties may

not rearrange the priorities of claims established under the Bankruptcy Code through a settlement

amongst professionals of the debtor's estate. C.f. *In re Holly Marine Towing Inc.*, 669 F.3d 796

(7th Cir. 2011).  Further, this Court has recognized that recoveries under Section 506(c) of the

Bankruptcy Code inure to the benefit of the debtor's bankruptcy estate as a whole.  *In re Resource

Technology Corp.*, 356 B.R. 435, (Bankr. N.D.Ill. 2006).

71

195.     In light of BMO's blanket liens and security interests and the value of the Debtors'

assets, however, a carveout of BMO's security interests for all potential administrative claimants

had to be addressed by Movant. Movant was aware of the significant range in values of the

Debtors' assets which could come in to play depending upon the outcome of the BP Litigation.

As the largest secured and unsecured creditor - by far - BMO's claims and interests would most

be enhanced by Movants and the Debtors' efforts. Movant therefore insisted upon a negotiated

carveout of BMO's liens and security interests to protect the Debtors' estates in the event that the

Debtors' were not successful in the BP Litigation

196.     As reflected in the Final Cash Collateral Order, as extended and the two (2) DIP

Financing Orders entered during the DIP Period, Movant was able to obtain the necessary

carveouts in these Chapter 11 Cases to cover the circumstances of these cases as of the end of the

DIP Period. The establishment of the Professional Carveout, the employee retention and

severance bonus "carveout"and the carveout for unpaid expenses pursuant to the DIP Financing

Orders in agreed upon amounts ensured that the Debtors' estates remained administratively

solvent while the efforts at reorganizing the Debtors and, subsequently, selling substantially all of

the Debtors' assets through the DIP Period continued.

## VII.
## BILLING JUDGMENT AND AVOIDANCE
## OF DUPLICATION OF SERVICES

197.     As set forth in In re Pettibone, 74 B.R. at 303, Section 330 of the Code provides

that compensation for actual and necessary services makes the exercise of billing judgment

"mandatory" in bankruptcy fee petitions. The estate should not bear the burden of duplication of

efforts which should be avoided by the exercise of good billing judgment.

72

198.    Movant is a small firm, which by definition prevents any significant duplication of efforts. Mark A. Carter, Nathan Q Rugg and Steven B. Chaiken have performed the vast majority of services outlined herein in connection with the Movant's representation of the Debtors. Every effort has been made to delineate specific tasks and, in so doing, to prevent an unnecessary overlap in representation. While certain matters required joint consultations, duplication has been judiciously avoided. When more than one attorney was needed, this was as a result of the great complexity of a given matter, the press of business, or if another member of the firm was handling a matter in some way connected with another activity. So, too, as with other matters, certain interoffice conferences between partners of the firm or a partner and an associate occurred as were necessary and beneficial for the estate. The benefit to the estate from these activities resulted in an associate being able to perform certain services which brought with it the lowered rates of the associate and also the associate's greater availability to perform such services. It is not realistic to expect associates with limited experience in a case to operate as efficiently as a partner with greater experience not only in a given case but in the practice of law. Accordingly, some joint participation in a case of this magnitude and activity is unavoidable. In fact, however, such overlap ultimately resulted in a more efficient and economic expenditure of time.

199.    Movant believes that it has instituted an efficient mechanism for maximizing the particular skills and resources of its personnel in these Chapter 11 Cases.

200.    Practically speaking, a small firm such as Movant's does not have the luxury of having more than one attorney generally handle any particular task. So, too, in a case with issues as complex as those presented to Movant here, at times certain problems required the collective judgment of the attorneys in the firm. Moreover, Movant has voluntarily eliminated and is not

73

seeking compensation for a significant number of time entries which could be construed as

duplication of work.  As a result, a review of the detailed statement of services rendered by

Movant in this case reflects that duplication of services, albeit at times necessary, was kept to a

minimum and in fact generated cost benefits to the estate.  The appropriateness of the billing

judgment of Movant can best be supported by the following analysis of the factors set forth in In

re Pettibone:

      A.    Individual Responsibility - A review of this Final Application will show that when

interoffice conferences were required, they were required primarily to facilitate the coordination

of effort and avoid the duplication thereof.  The Court will find few lengthy interoffice

conferences given the complexity and time sensitivity of the issues which have been addressed in

this Chapter 11 case. Movant has prepared this Application to comply with the billing guidelines

for office conferences as set forth in In re Adventist Living Centers, Inc., 137 B.R. 692, 697

(Bankr. N.D. Ill. 1991). In conformity with Adventist Living Centers, Movant has billed only

"active" attorney's time for office conferences.  However, if the office conference constituted (i) a

"status" conference wherein one attorney advises another as to matters pending in a case and

often assigns future work to be performed or (ii) a "strategy" conference wherein one or more

attorneys determine the course of action to be taken, then Movant has billed for all attorneys

involved in the conference.

      B.    Court Appearances and Meetings - There are few instances where more than one

attorney attended a particular court appearance. Meetings for particular matters have with rare

exceptions been attended by only one attorney. On certain occasions, it was necessary for more

than one attorney to attend a meeting or court hearing. The use of more than one attorney was

74

precipitated by the fact that such meetings or hearings usually led to the delegation of several

different activities, or involved discussions concerning information that could best be gained

firsthand.  Additionally, only on rare occasion and where necessary did more than one attorney

attend a court hearing.

      C.    Appropriate Level of Skill - As reflected in the time entries appended hereto, Mr.

Adelman and Mr. Gettleman provided oversight, and participated in a number of meaningful

discussions with the Debtors and others to chart the course of this proceeding and to identify

substantive concerns.  Messrs. Carter, Rugg and Chaiken worked in concert, but with a minimum

of duplication to implement the desired strategy reached in these sessions, and to otherwise carry

out the objectives of the Debtors.  Where appropriate, however, the legal work was handled by

other members of the firm to take advantage of lower billing rates.

      D.    Legal Research - Most of the legal research was performed by members of the firm

with lower hourly rates to further reduce the amount of fees in this case.

      E.    Document Review - A careful review of the detailed time entries will reflect that

there are very few entries for one attorney reviewing the work product of another attorney. In the

rare cases where such examination appears, it was necessary as a result of the press of time and

complexity of the matter involved. It is both necessary and expected that such complex legal work

will involve a certain amount of analysis by more than one attorney. The Court should be advised,

however, that these instances are few, and at no time was such a review simply a matter of

interest. Again, pursuant to the requirements of Adventist Living Centers, only the active

attorney's time is billed in this Application for a document review conference.

## VIII.
## QUALIFICATIONS OF MOVANT; PRECLUSION OF
## EMPLOYMENT DUE TO ACCEPTANCE OF THIS
## CASE; AND COST OF COMPARABLE SERVICES

201.    Adelman & Gettleman, Ltd. was established in 1983 and has been listed in The

Martindale-Hubbell Bar Register of Preeminent Lawyers since approximately 1985. The firm is

pleased to have a number of its lawyers listed in Naifeh and Smith's "The Best Lawyers in

America", Woodward/White; "America's Leading Lawyers for Business" by Chambers and

Partners; Illinois Super Lawyers, and Illinois Leading Lawyers Network.

202.    Movant has brought to bear on the problems of the Debtors the collective skill and

experience of the following members of Adelman & Gettleman, Ltd.:

### HOWARD L. ADELMAN

Mr. Adelman is a 1977 cum laude graduate of St. Louis University School of Law, and is

licensed to practice in the States of Illinois and Missouri. Upon his graduation from law school,

Mr. Adelman was law clerk to the Honorable Robert G. Dowd, Chief Judge of the Missouri Court

of Appeals, St. Louis District, and later became the Executive Judicial Assistant to the Missouri

Court of Appeals, St. Louis District.

In 1978, Mr. Adelman joined the firm of Schwartz, Cooper, Kolb & Gaynor, and was

made a partner in said firm in 1981. In 1983, Mr. Adelman formed the law firm of Adelman &

Gettleman, Ltd. with Chad H. Gettleman. Since entering private practice in 1978, Mr. Adelman

has devoted his entire professional practice to areas of commercial litigation, bankruptcy,

insolvency, and corporate reorganization. Mr. Adelman has participated in major bankruptcy

cases since 1978 as counsel to the Debtor as well as serving as counsel to the Creditors

76

Committee, has confirmed numerous plans of reorganization, and has tried and argued cases in the Bankruptcy Court and the United States District Court.

Mr. Adelman has appeared in the Seventh Circuit Court of Appeals on numerous occasions beginning with In re EDC Holding Company, 676 F.2d 945 (7th Cir. 1982). Mr. Adelman has been listed in the 1995 - 1996, 1997 - 1998, and 1999 - 2000 editions of Naifeh and Smith's "The Best Lawyers in America", Woodward/White (1999). In October of 1999, Mr. Adelman was appointed by Chief Justice William Rehnquist to serve as a member of the Judicial Conference Advisory Committee on the Federal Rules of Bankruptcy Procedure. Mr. Adelman was inducted as a Fellow of the American College of Bankruptcy, as part of its Twelfth Class.

CHAD H. GETTLEMAN:

Chad H. Gettleman is a 1976 graduate of Marquette University Law School, and is licensed to practice in the states of Illinois and Wisconsin. In 1973, Mr. Gettleman obtained his undergraduate degree in accounting from the University of Illinois and thereafter became a non-practicing Certified Public Accountant. Following his law school graduation, Mr. Gettleman went to work for the U.S. Securities and Exchange Commission in the branch of corporate reorganization of the Chicago Regional Office, which dealt with public interest cases in a twenty-two state area under Chapters X and XI of the old Bankruptcy Act. In 1979 Mr. Gettleman left government practice and joined the then oldest bankruptcy boutique firm in Chicago. He has been involved in major bankruptcy cases since 1976 and has confirmed numerous plans of reorganization. Mr. Gettleman has devoted his entire professional practice exclusively to the areas of commercial bankruptcy, insolvency, and reorganization since entering practice in 1976.

77

In 1983, Mr. Gettleman formed the law firm of Adelman & Gettleman, Ltd. with Howard

L. Adelman. Both Mr. Gettleman and Mr. Adelman remain the sole shareholder-principals of the

firm. From 2004 to 2008, Mr. Gettleman was chosen by his peers as a member of the Illinois

Leading Lawyers Network for Bankruptcy and Workout Lawyers and has also been listed in

Chambers USA (2008) an the Best Attorneys Network in the areas of bankruptcy and

reorganization. Most recently, from 2008 - 2011, Mr. Gettleman was elected by his peers as an

Illinois Super Lawyer in the area of bankruptcy and reorganization. He is a co-author of

"Representing the Secured Creditor and Adequate Protection," Business Bankruptcy Practice,

2006 ed., 2008 Supp., Illinois Institute of Continuing Legal Education, and also "Inside the Minds

- Attracting and Retaining Clients", 2008 ed., Aspatore Books (A Thomson Reuters Company).

He is a member of the Illinois State Bar Association, Chicago Bar Association (Bankruptcy and

Reorganization Committee), American Bar Association (Section on Corporation, Banking and

Business Law), and the State Bar of Wisconsin.

## HENRY B. MERENS

Henry B. Merens is a partner of the firm. Since his admission to practice in 1981, Mr.

Merens has concentrated in the areas of bankruptcy, real estate, civil litigation and commercial

transactions, and has had extensive experience in virtually all aspects of insolvency practice. Mr.

Merens has participated in numerous significant Chapter 11 cases, as counsel to debtors,

creditors, creditors' committees, secured lenders, trustees and other parties. As debtor's counsel,

Mr. Merens has confirmed a number of Chapter 11 plans of reorganization and has successfully

concluded multiple Chapter 11 liquidations involving going concerns sales of various business

enterprises. Mr. Merens has had several articles published in the fields of bankruptcy and

commercial practice, and has participated as a featured speaker at a seminar dealing with

mortgage foreclosures in Illinois, speaking on the interplay of bankruptcy and the foreclosure

process. In April 2009, Mr. Merens participated in a panel discussion sponsored by the National

Business Institute entitled "Bankruptcy Forum: What Judges And Trustees Want You To Know."

Mr. Merens covered the segment of the discussion concerning Real Estate Issues in Bankruptcy.

Mr. Merens has again been selected by his peers as an Illinois Super Lawyer for 2011. Mr.

Merens earned his B.A. degree at Trinity College and his J.D. degree at the Washington

University School of Law.

MARK A. CARTER

Mark A. Carter joined the firm in 1990 and was elevated to partner of the firm in 1996.

Mr. Carter received his undergraduate degree with high honors in 1985 from the University of

Illinois and his J.D. in 1988 from the University of Illinois, College of Law.  Since entering

private practice in 1990, Mr. Carter has represented a diverse range of public and private

companies, financial institutions, collective bargaining associations and bankruptcy trustees in

connection with business restructurings, workouts and related insolvency matters.  His practice

includes the representation of middle market companies in asset and business acquisitions,

construction matters, secured transactions and related corporate transactions.

Prior to joining Adelman & Gettleman, Ltd., Mr. Carter served as the law clerk for the

Honorable Richard N. DeGunther, U.S. Bankruptcy Court for the Northern District of Illinois

from 1988 to 1990.  Mr. Carter has published articles and spoken at seminars on insolvency

matters, including "Secured Interests in Bankruptcy," which was published in the Advanced

Commercial Finance and Creditor's Rights in Illinois IICLE Handbook and "Insolvency

79

Implications for the Limited Liability Company and Its Members" which was published in the
2013 Edition of the Limited Liability Companies and S Corporations IICLE Handbook. He is a
member of Illinois State Bar Association and is currently serving on the ISBA's Business and
Securities Law Section Council. He is also a member of the Chicago Bar Association, the DuPage
County Bar Association, the American Bankruptcy Institute and the Turnaround Management
Association.

## NATHAN Q. RUGG

Mr. Rugg became a principal of the firm in January 2009, and has represented individual
and corporate debtors, secured lenders, creditors, purchasers, guarantors, shareholders, and
assignees for the benefit of creditors in workouts, liquidations, reorganizations, refinancings
adversary proceedings, claim litigation and commercial litigation. He has been named by his
peers as a Rising Star in the Illinois Super Lawyers publication in the area of bankruptcy and
reorganization for 2009, 2010 and 2011. Mr. Rugg is a Co-Chair for the Bankruptcy Court
Liaison Committee and serves on the Volunteer Attorney Panel in the Northern District of
Illinois. Mr. Rugg is a 1997 graduate of Dartmouth College, and graduated from the University
of Illinois College of Law in 2000 *cum laude*. While attending the University of Illinois, Mr.
Rugg served as an Associate Editor of the University's Elder Law Journal. He is a member of the
Chicago Bar Association, Illinois Bar Association and the American Bankruptcy Institute.

## ERICH S. BUCK

Mr. Buck joined the firm in November 2007 and focuses his areas of practice in business
bankruptcy, reorganization and commercial litigation. Mr. Buck is a 1997 graduate of
Northwestern University and in 2001 graduated from the University of Iowa College of Law.

While attending the University of Iowa , Mr. Buck served as Managing Editor of the University's
*Journal of Gender, Race & Justice*. Upon graduating from law school, Mr. Buck served two
years as law clerk to the Honorable Carol A. Doyle of the United States Bankruptcy Court for the
Northern District of Illinois. Prior to joining Adelman & Gettleman, Ltd., Mr. Buck was an
associate at Reed Smith LLP (formerly Sachnoff & Weaver, Ltd.), where his practice focused
primarily on creditors' rights litigation. He has been named a Rising Star in the Illinois Super
Lawyers publication since 2009.

STEVEN B. CHAIKEN

        Mr. Chaiken joined the firm in January 2007 and focuses his areas of practice in business
bankruptcy, reorganization and commercial litigation. Mr. Chaiken is a 1997 graduate of the
University of Illinois, and graduated from the University of Illinois College of Law in 2000 *cum
laude*. Prior to joining the firm, Mr. Chaiken served as the general counsel for a
telecommunications company in South Florida with annual revenues exceeding $150 million.
Mr. Chaiken successfully assisted the company through a lengthy Chapter 11 which resulted in a
confirmed plan of reorganization. Mr. Chaiken was selected by his peers as an Illinois Rising Star
for 2010, 2011 and 2012.

ALEXANDER F. BROUGHAM

        Mr. Brougham joined the firm in September 2012 and focuses his areas of practice in
business bankruptcy, reorganization, and commercial litigation. Mr. Brougham is a 2006
graduate of Colby College and in 2009 graduated from the Northeastern University School of
Law. Upon graduating from law school, Mr. Brougham served as law clerk to two bankruptcy
judges in the United States Bankruptcy Court for the District of Massachusetts: first the

Honorable Joel B. Rosenthal, then the Honorable Melvin S. Hoffman when Judge Rosenthal

retired. Mr. Brougham then served a one-year term as law clerk to the Honorable A. Benjamin

Goldgar of the United States Bankruptcy Court for the Northern District of Illinois.

## REBECCA D. ROSENTHAL

Ms. Rosenthal was a member of the firm from May, 2007 until May of 2012, and

practiced in the areas of business bankruptcy, reorganization and commercial litigation. Ms.

Rosenthal graduated cum laude from Syracuse University in 1999 earning a B.S. in Accounting

and is a Certified Public Accountant (CPA). She graduated law school in 2008 from Loyola

University Chicago School of Law. During law school, Ms. Rosenthal earned a judicial

externship with the Honorable Susan Pierson Sonderby, United States Bankruptcy Judge for the

Northern District of Illinois.

## IX.

## RECAPITULATION OF SERVICES RENDERED DURING THE DIP PERIOD

The following is a summary of the legal services rendered by each member of Movant

during the DIP Period:

### Services Rendered During the DIP Period

| Attorney | Hours | Rate | Value |
|---|---|---|---|
| HLA | 55.60 | $460 | $ 25,576.00 |
| CHG | 133.70 | $460 | $ 61,502.00 |
| HBM | 54.10 | $460 | $ 24,886.00 |
| MAC | 2453.97 | $400/$430 | $ 1,051,509.32 |
| NQR | 288.60 | $370/$400 | $ 109,389.00 |
| SBC | 1666.51 | $295/$300 | $ 492,192.18 |
| ESB | 6.70 | $300 | $ 2,010.00 |

82

| Attorney | Hours | Rate | Value | |
|----------|-------|------|------|--|
| RDR | 36.50 | $265/$300 | $ | 10,855.50 |
| AFB | 250.80 | $300 | $ | 75,240.00 |
| JB | 34.70 | $125/$135 | $ | 4,517.50 |
| TOTAL | 4878.4 | | $ | 1,857,677.50 |

203.    As a result of the acceptance of employment as counsel to the Debtors in this case,

Movant was precluded from rendering services in other substantial legal matters. At various times

throughout the Chapter 11 Cases, Messrs. Carter, Rugg and Chaiken were required to spend a

significant portion of their time on matters involving the Debtors. The expertise of Messrs.

Adelman and Gettleman have been required in light of the complexity and time constraints of the

Chapter 11 Cases. The hourly rates charged by Movant are commensurate with the skill and

expertise brought to bear on the duties and responsibilities of the Debtors, and are substantially

less than the rates of many other bankruptcy practitioners of similar or lesser experience.

## X.
## MOVANT'S STATEMENT PURSUANT TO §§ 329 AND 504
## OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 2016

204.    Except with respect to the sharing of compensation authorized under Section

504(b) of the Code, Movant has not shared or agreed to share any award of fees received in

connection with this case with any person, firm or entity. There does not exist any agreement or

understanding between Movant, associates or employees, and any other person, firm or entity

with respect to the sharing of compensation herein.

## XI.
## NOTICE

205.    In accordance with Bankruptcy Rules 2002(a)(6) and 2002(c)(2), Movant has

provided 21 days notice of the hearing of this Application (the "**Notice**") to the office of the U.S.

Trustee, the Internal Revenue Service, the Debtors, all creditors, all counsel of record and other

parties requesting notice in the Chapter 11 Cases.  Movant has also served the  Application on the

office of the U.S. Trustee, the Internal Revenue Service and all counsel of record and, as

expressly set forth in the Notice, has made copies of the Application available to any party upon

request.  Movant submits that such notice is adequate under the circumstances, and requests that

any further notice requirement be waived and/or reduced in accordance with Rules 2002(a)(6),

2002(c)(2) and 9006(c).

## XII.
## CONCLUSION AND REQUEST FOR ALLOWANCE
## AND PAYMENT OF FINAL COMPENSATION
## AND REIMBURSEMENT OF EXPENSES

206.    For the above and foregoing reasons, in consideration of the time and labor

required and performed in this case; the novelty and difficulty of the matters herein; the skill

required to properly and efficiently perform the legal services; the preclusion of employment of

Movant in other matters due to the complexity of this case during the DIP Period; the customary

fees involved in comparable matters; the nature of the matters requiring Movant's involvement;

the experience, reputation and ability of Movant, the level of commitment required of Movant

throughout the DIP Period, the results achieved; and the continued assistance provided by Movant

to the Trustee after the Appointment Date, Movant respectfully requests that (i) final

compensation in the amount of $1,857,677.50 and reimbursement of ordinary and necessary

84

expenses incurred in connection therewith in the amount of $31,900.47 (see **Schedule J** attached

hereto) sought herein be determined to be reasonable, necessary and justified, and that the fees

and costs requested be approved and allowed; and (ii) that payment of $361,403.44, after

deduction of $1,528,174.63 in net payments and prepayments, be ordered to be made forthwith

from funds currently held by the Trustee.

     WHEREFORE, Mark A. Carter, Steven B. Chaiken and Adelman & Gettleman, Ltd., pray

for the entry of an order in accordance with the foregoing in the form filed herewith and for such

further relief as is just.

                     Respectfully submitted,

                     ADELMAN & GETTLEMAN, LTD.

                     By:_____/s/ Mark A. Carter_____
                         MARK A. CARTER

MARK A. CARTER, ESQ. (ARDC #6199602)
STEVEN B. CHAIKEN, ESQ. (ARDC #6272045)
ADELMAN & GETTLEMAN, LTD.
53 West Jackson Boulevard, Suite 1050
Chicago, Illinois 60604
312-435-1050
Counsel to the Debtors